**WESTINGHOUSE ELECTRIC CORPO-RATION, Plaintiff,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants,**

and

**The Baltimore and Ohio Railroad Company, et al., Intervening Defendants.**

Civ. A. No. 73–432.

United States District Court,
W. D. Pennsylvania.

Feb. 4 1975.

Stephen T. Wardzinski, Westinghouse Electric Corp., Henry M. Wick, Jr., Pittsburgh, Pa., for plaintiff.

Richard L. Thornburgh, U. S. Atty., Charles White, I. C. C., Peter A. Fitzpatrick, Interstate Commerce Commission, Washington, D. C., for defendants.

John J. Paylor, Baltimore, Md., George J. Schwarz, New York City, Wallace D. Stewart, Pittsburgh, Pa., for intervening defendants.

## OPINION

DUMBAULD, District Judge.

 This case involves an interesting aspect of the time-honored principle that the rates charged by common carriers for the transportation of freight must be just and reasonable. At common law a shipper might sue the carrier to recover the excessive charges. Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 436, 27 S.Ct. 350, 51 L.Ed. 553 (1907). A new era began with enactment of the Interstate Commerce Act in 1887, creating the Interstate Commerce Commission. Thereafter primary jurisdiction to determine the reasonableness of rates was vested in the Commission. *Ibid.*, 442, 448, 27 S.Ct. 350. Judicial review of Commission orders, ordinarily effected through a three-judge court, is performed by a single judge in the case of orders granting or denying reparation for excessive charges by a carrier. United States v. I. C. C., 337 U.S. 426, 441–443, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949). Such an order is attacked by a shipper in the case at bar. The limited scope of review is the same as when a three-judge court is required. That topic was recently discussed in some detail by this Court in Pgh. & New England Trucking Co. v. United States, 345 F.Supp. 743, 747–748 (W.D.Pa.1972), aff'd United States v. I. C. C., 409 U.S. 904, 93 S.Ct. 235, 34 L.Ed.2d 169 and 409 U.S. 1070, 93 S.Ct. 686, 34 L.Ed.2d 660.

Under the Interstate Commerce Act carriers are required to charge rates specified in published tariffs. Such rates are known as *legal* rates. However the legal rate is not necessarily a *lawful* rate: "it was lawful only if it was reasonable . . . [T]he shipper was bound to pay the legal rate; but if he could show that it was unreasonable, he might recover reparation." Arizona Grocery Co. v. A., T. & S. F. Ry. Co., 284 U.S. 370, 384, 52 S.Ct. 183, 184, 76 L.Ed. 348 (1932). In the case of rates prescribed by the Commission (as distinguished from carrier-initiated rates) there is "no difference between the legal or published tariff rate and the lawful rate." *Ibid.*, 387, 52 S.Ct. 185. But "the great mass of rates" are "carrier-made rates, as to which the Commission need take no action except of its own volition or upon complaint, and may in such case award reparation by reason of the charges made to shippers under the theretofore existing rate." *Ibid.*, 390, 52 S.Ct. 186.

Since a carrier must be able to charge a legal published tariff rate for any article tendered to it for shipment anywhere, tariffs contain "classifications" or "lists containing descriptions of every commodity moving by freight and the class or classes to which it is assigned, *i. e.*, its *classification rating* or *ratings*. . . . The *class rates* are in the form of a schedule which shows the price per 100 pounds for moving first-class freight every possible distance it may be moved. The cost of shipment for a given commodity is determined by ascertaining its classification rating, the first-class rate per 100 pounds for the haul involved, and the percentage of the first-class rate to which the classification rating in question is subject." N. Y. v. United States, 331 U.S. 284, 290, 67 S.Ct. 1207, 1238, 91 L.Ed. 1492 (1947). But class rates "move but a small percentage of the traffic." *Ibid.*, 343, 67 S.Ct. 1238. Hence they are often called "paper rates." Where there is a substantial volume of traffic moving, it usually moves on another type of rate, which is ordinarily lower than the class rate which must theoretically be available for any sort of unusual shipment which might be tendered to a carrier. It should be noted that

"*Exception* rates are rates resulting from the transfer of a commodity out of its regularly assigned class in the classification and into another class.

"*Commodity* rates are special rates established for particular commodities. For purposes of these rates a commodity is not given a classification rating; the result is that the com-

modity rates have no fixed percentage relationships to first-class rates.

"*Column* rates are fixed as definite percentages of first-class rates but like commodity rates they apply only to particular commodities and are assigned no regular class." *Ibid.*, 290, 67 S.Ct. 1210.

It should also be observed that where a shipment moves over the lines of two or more carriers, the through rate for such shipment may be calculated as a *combination* rate by adding the local rates of each carrier over its own line for the route of movement used; or may be a combination of several factors ("proportional" rates) published for use in determining through rates over such route; or may be the sum of local and joint factors; or may be a joint *single-factor* rate published specifically as a joint rate in which the carriers participate who are involved in the movement. St. L. S. W. Ry. Co. v. United States, 245 U.S. 136, 139, 38 S.Ct. 49, 62 L.Ed. 199 (1917) [Brandeis, J.].

The routes over which a rate is applicable must be specified in the published tariff, and the rate constitutes a legal rate only over available tariff routes. Any resemblance between available tariff routes and the most direct physical route over existing railroad tracks is purely coincidental. While carriers are compellable to establish reasonable through routes and joint rates, preference is ordinarily given to the carrier originating the traffic and each carrier is entitled to preserve its long haul over its own lines over as much of the distance as possible between the origin and destination points of the through route. *Ibid.*, 143–144, 33 S.Ct. 49.

With these facets of "railroad jargon [1]" in mind, we are in a position to examine what took place in the case at bar. The facts are basically undisputed, but are to be gleaned from the written statements filed by the parties rather than from the cross-examined testimony of witnesses "on the hoof", since the case

was heard under the Commission's abbreviated "modified procedure." Under this procedure the waggish pronouncement is perhaps truer than usual that in I.C.C. practice the lawyers do the testifying and the witnesses elucidate the applicable law.

Two types of shipment by the same shipper (the plaintiff) are involved. The plaintiff, hereinafter called Westinghouse, is a prominent manufacturer of electrical equipment. It shipped nine carloads of circuit breakers and parts from Trafford, Pa., to Buckeystown and Doub, Md. This transportation is involved in No. 35439. Plaintiff also shipped an electric generator, on a car owned by plaintiff, from East Pittsburgh, Pa., to Potomac Electric Power Co., at Woodzell, Md. This shipment gave rise to No. 35415 before the Commission.

In both instances the shipments, because of their large weight or size, could not be handled over the established routes between origin and destination for which the usual published tariff rates were applicable. Instead the carriers collected the *legal* rates over the actual route of movement. They admit, however, that such rates are excessive, and that shipper is entitled to a *lawful* (*i. e.*, reasonable) rate over the route of movement. The dispute is as to what constitutes such a reasonable rate.

With regard to the circuit breakers (disregarding arithmetical overcharge), the normal published rate from Trafford to Buckeystown and Doub (over a route through Frederick, Md., of 320.7 miles to Buckeystown and 323.6 miles to Doub, 313 miles in each case being Penn Central) is a single-factor Column 2300 rate of 79 cents per hundred pounds. The short-line distance to both destinations is 260 miles.

It happens that Penn Central is party to a route from Trafford via Hyndman to Point of Rocks, Md. That destination takes Frederick basis, and is 3.4 miles

---

1. Bd. of Trade v. United States, 314 U.S. 534, 542, 62 S.Ct. 366, 86 L.Ed. 432 (1942) [Frankfurter, J.].

from Doub and 6.3 miles from Buckeystown. In a route via Hyndman rather than via Frederick the Penn Central's on-line haul to the interchange point would be 173 miles rather than 313 miles. No explanation is given why Penn Central published the rate to Point of Rocks; such a route (short-hauling Penn Central) would probably not be established by Commission action under Section 15(4) of the Act; but, having been voluntarily established by the carriers, may legitimately be taken by plaintiff as a basis of rate-comparison of rates for comparable distances as a standard of determining reasonableness. However, plaintiff's inference is weakened by the fact that no traffic in the involved commodity is shown to have moved to Point of Rocks over this route.

The actual route of movement was 297 miles to Buckeystown and 294.1 miles to Doub. The route was Penn Central to Hyndman, Pa. (173 miles) thence B&O to destination (124 and 121.1 miles). The rate collected was calculated as a combination rate of 118.25 cents, being the sum of 56.5 cents from Trafford to Hyndman, and 51.5 cents from Hyndman to Buckeystown and Doub (plus certain applicable general increases). With respect to the circuit breaker shipments the carriers contend that the legal rate of $1.1825 is lower than the maximum reasonable rate of $1.25 calculated by applying the Class rates,[2] and hence that no reparation is due.

With regard to the generator (disregarding special train charges, which were separately paid and as to which there is no contest), a single-factor column 2380 rate of $1.33 is applicable from origin to destination over Penn Central.[3] This route would have been 319 miles.

The actual route of movement was 476.9 miles; Penn Central 323 miles to Cumbo, W. Va. (involving a local rate of 92 cents); thence B&O. 97.9 miles to Ft. George Meade, Md. (local rate 66 cents); and thence 56 miles to destination over Penn Central to destination (local rate 57 cents); for a total rate of $2.15.

The carriers indicated willingness to make reparation to the Class 45 rating in Item 34760 over the mileage estimated by plaintiff (476.9 miles) resulting in a rate of $1.57 as against the $1.33 calculated by plaintiff using the Column 2380 basis (equivalent to 38% of first class, rather than 45% as sought by the carriers).

It may also be accepted as an uncontradicted fact that at no time have the commodities involved ever moved in Eastern territory at class rates, or at rates exceeding the Column rate basis.

It is also a fact that on a number of previous occasions the carriers have voluntarily made reparation to the level of the Column rates in so-called "Special Docket" proceedings before the Commission. The printed form prescribed by the Commission for use in such proceedings since 1934 contains an admission that the legal rate collected was unreasonable: "It is admitted that the rates or rules legally applicable at the time and over the route shipment moved were, under all the circumstances and conditions then existing, excessive and unreasonable."

Two instances in which such disposition was made involved a movement for account of Westinghouse using the very car (WECX-101) in which the generator moved in the shipment involved in. the case at bar.[4]

---

2. Class 45 rating published in Item 34410, Uniform Freight Classification 9, I.C.C. 5, in conjunction with Trunk Line—Central Territory Railroads Tariff Bureau Tariff E–1009–A, I.C.C. C–391.

3. Column 2380 is provided for shipments of MACHINERY APPLIANCES AND SUPPLIES, ELECTRICAL, for weight exceeding 75,000 pounds or requiring special type of car because of dimensions regardless of weight, in item 34020 of TL-CTRTB Tariff

E 2009–H, ICC C–73, p. 266. Item 1300 of that tariff at p. 148, specifies the coverage of the electrical machinery item, and includes Generators.

4. SDA No. 14753, S.D. No. 239407; SDA No. 14683, S.D. No. 239067, attached to brief of intervening defendants. Twelve examples of Special Docket cases in 1967 and 1968 where Penn Central agreed to use of column rates are referred to in No. 35417, McGraw-Edison Co. v. B. & O. R. R. Co.

However, apparently at some date in 1969, the rate bureau for eastern territory [Traffic Executive Association— Eastern Railroads, or TEA–ER] adopted the position that carriers should not voluntarily make reparation in special docket proceedings except by application of the class rates.

A letter of E. J. O'Connor (Penn-Central Manager-Commerce) dated August 5, 1969, states that "in view of the action recently taken by the Traffic Executive Association—Eastern Railroads with respect to disposition of Bucyrus-Erie reparation claims, eastern carriers are henceforth unable to progress such claims on any basis other than obtained by use of the classification ratings and resultant rates based on actual route of movement distance."

The actual terms of the docket item before TEA–ER and its disposition notice do not appear in the record before this Court. Presumably there was compliance with appropriate procedures pursuant to the "Bulwinkle" provisions of 49 U.S.C. 5b (added in 1948) so as to obtain dispensation from the strictures of the Antitrust laws. United States v. Trans-Missouri Freight Assn., 166 U.S. 290, 341, 17 S.Ct. 540, 41 L.Ed. 1007 (1897); United States v. Joint Traffic Assn., 171 U.S. 505, 565, 19 S.Ct. 25, 43 L.Ed. 259 (1898); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 225–227, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); Sunshine Coal Co. v. Adkins, 310 U.S. 381, 396, 60 S.Ct. 907, 84 L.Ed. 1263 (1940); P.&L.E.R.R. Co. v. United States, 294 F.Supp. 86, 93 (W.D.Pa. 1968); Dumbauld, "Rate-Fixing Con-

piracies in Regulated Industries", 95 U. of Pa. L.R. 643–60 (May, 1947).

The carriers now contend [Brief p. 12] that:

In progressing special docket applications on *Bucyrus-Erie* type shipments prior to 1969, the railroads in Eastern Territory admittedly misinterpreted the *Bucyrus-Erie* principle in failing to observe the prescribed class rate basis as the reasonable basis.

However, it would seem that the carriers did not "misinterpret" the *Bucyrus-Erie* principle,[5] but rather they "reinterpreted" it in a manner that would bring in more revenue.[6] Their "eisegesis" of the principle may have had an economic rather than juridical motivation. "Simply because bankruptcy and other adverse conditions have caused the carriers to shift from a time honored position to seek a higher level of rates for reparation purposes", as the examiner concluded in No. 35568,[7] the proper interpretation of the *Bucyrus-Erie* principle does not necessarily fluctuate.

█ The *Bucyrus-Erie* principle, it should be explained, is that a shipper is entitled to *a reasonable rate over the actual route of movement* when the normal route between origin and destination can not be used because the weight or dimensions of the shipment make transportation over the normal route impossible.

This principle was ennunciated in Bucyrus-Erie Co. v. N. Y. Central R. R. Co., 196 I.C.C. 1 (1933).[8] It would have been conceivable for the Commission in that case to have established

5. The attitude of the carriers is more appropriately characterized by the examiner in No. 35580, McGraw-Edison Co. v. B. & O. R. R. Co., Feb. 11, 1974, as "the railroads' change of policy" rather than as a "misinterpretation" of the *Bucyrus-Erie* principle.

6. From the Commission's standpoint as a regulatory agency, the carriers' new policy has also the advantage of producing uniformity with respect to reparations on shipments in eastern territory with those to southern and western territory. See case cited in note 4, *supra*. However, the same case shows that class rates have in fact

moved traffic on shipments to those territories.

7. April 12, 1973, Westinghouse Electric Corp. v. Penn Central Transportation Co., et al., rev'd by Review Board No. 4, February 14, 1974.

8. The Court gratefully acknowledges that, in view of its limited library facilities, counsel for plaintiff and the railroads have kindly furnished photocopies of this and other I.C.C. cases cited in their briefs, as well as of cases not printed in the Commission's reports.

the rule (contended for by the complainant there, and favored by Commissioner McManamy) that the normal rate should have been "protected" over the route of movement (just as where for "carrier convenience" or "carrier disability" a passenger entitled to a lower berth is given a drawing room without additional charge, as is said to have often occurred in the case of high-ranking military personnel during World War II). As stated by Commissioner McManamy:

I disagree with the restricted interpretation of the tariff here made under which the shipper is required to pay a higher rate because the carrier is unable to handle the shipment over the usual route. Certainly restricted clearances which require diversion of shipments from the usual route is one of the "exigencies of carriers" intended to be covered by the so-called emergency clause in the tariffs for which the shipper should not be penalized.

However, the decision reached by the Commission was justified by its closer conformity to the realities of the situation. The shipment in fact did move over the actual route of movement, rather than over the normal route for which the applicable tariff rate was constructed. A reasonable rate over the route of movement seems to be a result eminently fair both to carrier and shipper. The Commission declared: "We have frequently said that regardless of a choice of available routes, a shipper is entitled to a reasonable rate over the route of movement" (199 I.C.C. at 2).

The article involved in the *Bucyrus-Erie* case was a power shovel, rated fifth class. Over the normal route of 593 miles a joint fifth-class rate of 36.5 cents applied via New York Central to Buffalo, N. Y., Erie to Binghamton, N. Y., and Delaware and Hudson to destination. The route of movement was 520 miles via N. Y. C. to Norwood, N. Y., the Rutland to Rouses Point, N. Y., and D. & H. to destination. From Syracuse to Norwood the movement was over a mountainous and sparsely settled branch line haul.

The Commission found that in the eastern-class rate proceeding a maximum of 40 cents had been prescribed as a fifth class rate for a haul of 520 miles in the territory involved. Adding an arbitrary for the D. & H. branch-line haul from Bluff Point, N. Y., to Dannemora made a fifth class rate of 41 cents for the distance over the route of movement. Reparation to the 41 cent level was ordered.

It will be noted that in the *Bucyrus-Erie* case the level used for reparation was the class rate; but it will also be noted that the tariff applicable over the normal route was also a class rate.

There has been considerable discussion of the effect of cases under Special Docket procedure. On the one hand, technically, such cases rest upon the same legal basis as contested cases. Swift & Co. v. C. & A. R. R. Co., 16 I.C.C. 426, 428–29 (1909); Tennessee Eastman Corp. v. L. & N. R. R. Co., 198 I.C.C. 639, 640 (1934). On the other hand, orders made in such cases are not controlling precedents binding upon the Commission as prescribed maximum reasonable rates in litigated formal cases. Pullman-Standard Car Co. v. P. R. R. Co., 281 I.C.C. 445, 449 (1951).

This issue is substantially similar to that with respect to the precedential effect of denial of certiorari as compared with affirmance upon motion and without argument of a direct appeal (as from a three-judge court). United States v. Carver, 260 U.S. 482, 490, 43 S.Ct. 181, 67 L.Ed. 361 (1923) [certiorari]; Edelman v. Jordan, 415 U.S. 651, 671, 94 S. Ct. 1347, 39 L.Ed.2d 662 (1974) [summary affirmance]. See also Fusari v. Steinberg, 419 U.S. 379, 95 S.Ct. 533, 42 L.Ed.2d 521, decided January 14, 1975 [Chief Justice Burger, concurring]. Undoubtedly the force of a case is strengthened when there has been full argument and a detailed opinion (or opinions) written. Since Lord Coke's time the virtues of oral argument have been recognized as a means of divinely illuminating the minds of the tribunal. Pref. to 9 Rep.

The chief value of the uniform course of Special Docket cases is as evidence of reasonableness. Such evidence is highly persuasive in that is manifests the expert opinion of the railroad managements in a matter constituting an admission against interest. As such, it should be given great weight with respect to the issue of reasonableness of rates.

As pointed out in the case at bar (in No. 35439 by Review Board No. 4, "it is well established that there is no precise mathematical formula or method for determining a maximum reasonable rate."

The Board then goes on to say that "To the extent there is a general guide in determining maximum reasonableness in *Bucyrus-Erie* type cases, it appears to be the class-rate scale applied to the distance over the route of movement."

In support of this conclusion that class rates should be applied Westinghouse Electric Corp. v. P. R. R. Co., 323 I.C. C. 503, 506–507 (1964), is cited. Other cases to the same effect, relied on by defendants, include Union Iron Works v. N. Y. C. R. R. Co., 218 I.C.C. 607, 609 (1936); Hudson Pulp & Paper Corp. v. Boston & Maine R. R., 276 I.C.C. 668, 670 (1950) [here the rate over the normal route was itself a class rate as in *Bucyrus-Erie*]; and the current cognate cases of Westinghouse Electric Co. v. Penn Central Transportation Co., No. 35568, Feb. 14, 1974 [generators to Newport News, Va.]; McGraw-Edison Co. v. B. & O. R. R. Co., No. 35580, Feb. 11, 1974; McGraw-Edison Co. v. B. & O. R. R. Co., No. 35417, June 8, 1973.

On the other hand, plaintiff cites cases where rates lower than prescribed rates were accepted as reasonable maxima for computing reparation. These cases involve voluntarily established rates intended to apply on building materials shipped to construction sites. However, because of inadvertence or technical reasons these rates were not in fact effective at the time when the movement took place. In C. A. Wagner Construc-

tion Co. v. C., M., St. P. & P. R. R. Co., 219 I.C.C. 317, 318 (1936), Division 4 said:

The rate sought is somewhat lower than rates we have prescribed or approved on sand for similar distances in this territory. However, in view of the unusually heavy loading, volume of movement, and other special circumstances previously referred to herein, we are of opinion that the applicable rate was unreasonable.

This reasoning was followed in Booth & Olson Inc. v. C., B. & Q. Ry. Co., 222 I. C.C. 569, 570 (1937); and North American Cement Co. v. W. Md. Ry. Co., 235 I.C.C. 27, 28 (1939).

■ It is a basic principle of rate regulation that there exists an extensive "zone of reasonableness", within which a carrier is ordinarily free to exercise its discretion in initiating rates. United States v. C., M., St. P. & P. R. R. Co., 294 U.S. 499, 506, 55 S.Ct. 462, 79 L.Ed. 1023 (1935). Only when a complaint is filed by a shipper or competing carrier, or an investigation is instituted by the Commission on its own motion, does the Commission's power to prescribe maximum or minimum, or maximum and minimum, or specific rates, come into play.[9]

■■ Hence before a carrier can be required to make reparation for an unreasonably high rate, it must be shown by the shipper that the rate charged exceeds the *maximum reasonable* rate appropriate under the circumstances. This can best be shown by demonstrating that the rate charged exceeds the maximum reasonable rate prescribed by the Commission under Section 15(1), if that happens to be the fact.

■■ Where no prescribed Commission rate is available to establish the maximum reasonable rate, the complainant may fail to meet the burden of showing the unreasonableness of the challenged rate. A commodity rate is

---

9. 49 U.S.C. 15(1). This power was first conferred upon the Commission by Congress in 1906. Skinner & Eddy Corp. v. United States, 249 U.S. 557, 564, 39 S.Ct. 375, 63 L.Ed. 772 (1919).

often a carrier-initiated rate, and may have been for various reasons of business expediency [10] established at a lower plane in the zone of reasonableness than at the maximum reasonable level.[11] Hence it is more difficult to prove that a commodity rate (if not Commission-prescribed) is a maximum reasonable rate. However, the task is not an impossible one.

■ There are many customary criteria which the Commission and carriers apply in evaluating the reasonableness of rates. These include, *inter alia*, cost of service (car-mile costs and revenue are frequently examined in this connection); value of service (what the traffic will bear); the existence *vel non* of competition; the transportation characteristics of the commodity (weight, size, density: gold vs. feathers is an example often used as an illustration by rate economists; likewise sand and gravel vs. perishable fruit or vegetables); the anticipated volume of shipments; the distance of the haul; the availability of return loads in the type of equipment used; the economic status of the industry served; the rate level required in order to move the traffic; comparison of the rate under consideration with established rates for comparable shipments in the territory involved; and other pertinent considerations. These criteria are habitually employed by the Commission when making a determination of reasonableness.

Applying the foregoing doctrines of rate regulation law to the action of the Commission in the case at bar, what conclusions emerge?

In the first place it seems clear that what the *Bucyrus-Erie* principle requires is that the carrier charge a *reasonable* rate over the route of movement (not necessarily a class rate).

■ In the next place, it would seem that the reasonableness of a rate (more specifically the maximum reasonable rate for purposes of reparation) must be determined by the Commission by applying the traditional and usual criteria which it habitually uses in making such determinations. As previously indicated, there are many factors to be considered. As Review Board No. 4 itself pointed out in the case at bar (in No. 35439), "there is no precise mathematical formula or method for determining a maximum reasonable rate."[12]

■ However, what the Commission actually did in the case at bar was to utilize a mechanical formula, instead of making the judgmental determination which would have followed from consideration of the traditional pertinent rate-making criteria in their application to the circumstances involved in the case at bar. In opting for the automatic ap-

---

10. For example, rates on export traffic lower than on domestic traffic have been customary. Pullman-Standard Car Mfg. Co. v. P. R. R. Co., 281 I.C.C. 445, 447–48 (1951). Water-compelled or truck-compelled rates to meet competition are another familiar instance. Water-competitive rates are often increased during the winter season when freezing weather makes navigation impossible. Rundle Mfg. Co. v. C. & N. W. Ry. Co., 251 I.C.C. 673, 674, 676 (1942). Or a favorable rate may be established to attract the business of a substantial shipper. Plaintiff argues cogently that the minimum weights specified for application of the published column rates show that the railroads have a monopoly of the type of traffic involved in the case at bar, and hence that the published rates are not depressed by competition but are probably maintained at the maximum reasonable level.

11. Thus the voluntary reduction of a rate is not *per se* proof that the prior rate was unreasonably high. Atmospheric Nitrogen Corp. v. N. & W. Ry. Co., 195 I.C.C. 747, 748 (1933). Class rates are ordinarily the maximum permissible level, and a commodity rate in excess of class rates would be an anomaly to be viewed with suspicion. Westinghouse Electric Corp. v. P. R. R. Co., 323 I.C.C. 503, 507 (1964); All States Freight v. N. Y., N. H. & H. R. R. Co., 379 U.S. 343, 345–346, 353, 85 S.Ct. 419, 13 L.Ed.2d 324 (1964). Cf. Director General v. Viscose Co., 245 U.S. 498, 502, 41 S.Ct. 151, 65 L.Ed. 372 (1921).

12. Indeed, the multi-faceted task greatly resembles that of establishing valuation. See FPC v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333 (1944).

plication of class rates, the agency abdicated its discretionary expertise. Perhaps for the sake of adopting a simple rule for dealing with a complex question,[13] because conducive to administrative economy or uniformity in application, the Commission neglected to exercise its function of evaluating the specific situation presented for its determination.

■ Plaintiff also argues that the Commission "has not adequately explained its departure from prior norms." Sec. of Agriculture v. United States, 347 U.S. 645, 653, 74 S.Ct. 826. 831, 98 L.Ed. 1015 (1954). See also A., T. & S. F. Ry. Co. v. Wichita Board of Trade, 412 U.S. 800, 808, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973). This contention is not convincing. It is not necessary that Commission decisions be consistent. Virginian Ry. Co. v. United States, 272 U.S. 658, 666, 47 S.Ct. 222, 71 L.Ed. 463 (1926); Virginia Stage Lines v. United States, 48 F.Supp. 79, 83 (W.D.Va. 1942). Indeed, to hold otherwise would be to condemn the practice of the United States Supreme Court, and now, indeed, since 1966, that of the English House of Lords.[14] There is nothing obscure or unclear about the Commission's action. Cf. United States v. C., M., St. P. & P. R. R. Co., 294 U.S. 499, 511, 55 S.Ct. 462, 79 L.Ed. 1023 (1935). What the Commission did is plain. The trouble is that what it did was wrong. The Commission did not depart from the *Bucyrus-Erie* principle; it acknowledged that plaintiff was entitled to a reasonable rate over the route of movement. The inadequacy was in the procedure adopted for determining what constitutes a reasonable rate: the traditional tests of reasonableness were not applied and the pertinent factors considered and evaluated; the class rate level was swallowed at a gulp without chewing.

■ The rates which the Commission chose for reparation purposes,

although they appear to have been *prescribed* rates, were nevertheless prescribed as *class* rates. The evidence in the case at bar, however, clearly shows that in eastern or Official Territory the commodities involved never had moved on the basis of class rates. Hence those rates, for ought we know, were simply paper rates, and may have been as inappropriate for reparation purposes as the prescribed rates on building materials which the Commission disregarded as maximum reasonable rates in the cases cited by plaintiff. In many cases cited by defendant, where class rates were found to be the reasonable maximum rates, careful examination will indicate that the Commission did independently test the appropriateness of the class rates by the traditional criteria. In many of those cases, moreover, careful examination will indicate that the traffic in question normally moved at class rates over the usual tariff routes; under such circumstances they were found to constitute an appropriate standard for application over the route of movement under the *Bucyrus-Erie* principle. That principle, it will bear repeating, calls for a *reasonable* rate over the route of movement, not necessarily a class rate. The class rate, when tested by the traditional criteria, having regard to the commodity and territory involved, might be utterly unsuitable as a reasonable maximum for reparation purposes.

Clearly, additional findings are needed. It would not be too harsh to say that, in the legal sense, the Commission's action is arbitrary, and constitutes a departure from applicable legal standards. Hence we conclude that the challenged orders in No. 35439 and No. 35415 must be set aside, and the cases remanded to the Commission for further consideration in accordance with applicable law.

### JUDGMENT

And now, this 4th day of February 1975, for the reasons set forth in the

---

13. Mere administrative inconvenience does not outweigh the rights of the parties to a well-considered decision by the agency. Goldberg v. Kelly, 397 U.S. 254, 265–266, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970);

Stanley v. Illinois, 405 U.S. 645, 656, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).

14. H. G. Hanbury, English Courts of Law (4th ed. 1967) 58.

foregoing opinion, it is ordered, adjudged, and decreed that judgment be and it hereby is rendered in favor of plaintiff, Westinghouse Electric Corporation, and against defendants United States of America and the Interstate Commerce Commission, and intervening defendants Baltimore and Ohio Railroad Company, and George P. Baker, Richard C. Bond, and Jervis Langdon, Jr., Trustees of the property of Penn Central Transportation Company, debtor;

And that the orders of the said Interstate Commerce Commission attacked in the above-styled cause, to wit those dated April 4, 1972, (reconsideration denied November 22, 1972, and December 27, 1974) in No. 35415, and dated April 4, 1972 (reconsideration denied November 22, 1972 and December 27, 1972) in No. 35439, respectively, be and they hereby are set aside and for nought holden; and that said matters be and they hereby are remanded to said Commission for further consideration in accordance with applicable law.