555 F.2d 637
 BURLINGTON NORTHERN, INC., et al., Petitioners,
v.
The UNITED STATES of America and Interstate Commerce
Commission, Respondents,
San Antonio, Texas, Acting By and Through its City Public
Service Board, Intervenor-Respondent.
 No. 76-1899.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 15, 1976.
Decided March 29, 1977.
 
 Howard J. Trienens, Chicago, Ill., for petitioners; Curtis H. Berg and Richard M. Gleason, St. Paul, Minn., Charles W. Burkett, San Francisco, Cal., Albert E. Schoenbeck, St. Louis, Mo., R. Eden Martin and James W. Jandacek, Chicago, Ill., on the brief.
 Charles W. White, I. C. C., Washington, D. C., for respondents; Donald I. Baker, Asst. Atty. Gen., and Lloyd J. Osborn, Atty., Dept. of Justice, Washington, D. C., Mark L. Evans, Gen. Counsel, and Walter H. Walker, III, Atty., I. C. C., Washington, D. C., on the brief.
 William L. Slover, Washington, D. C., for intervenor-respondent, City of San Antonio; C. Michael Loftus, Washington, D. C., on the brief.
 Richard P. Bruening, St. Louis, Mo., Richard M. Freeman, San Francisco, Cal., Mark M. Hennelly, St. Louis, Mo., Howard D. Koontz, Chicago, Ill., J. L. Lenihan, Louisville, Ky., R. K. Merrill, C. George Niebank, Jr., Chicago, Ill., C. Barry Schaefer, Omaha, Neb., James L. Tapley, Washington, D. C., Walter G. Treanor, San Francisco, Cal., Donal L. Turkal, and Richmond C. Coburn, St. Louis, Mo., on brief for amici curiae Railroads.
 Before HEANEY, ROSS and STEPHENSON, Circuit Judges.
 HEANEY, Circuit Judge.
 
 
 1
 Burlington Northern, Inc., and its subsidiaries, and Southern Pacific Transportation Company ask us to review a final order of the Interstate Commerce Commission which prescribes a maximum reasonable rate of $10.93 per ton for the movement of coal from Campbell County, Wyoming, to San Antonio, Texas. We deny the petition.
 
 
 2
 The origins of this dispute lie in the energy crisis. San Antonio, acting through its City Public Service Board, owns and operates an electric utility which from its inception used natural gas as its primary fuel. San Antonio purchased this gas on a long-term contract for approximately $.24 per MCF. In 1972, its supplier was no longer able to make deliveries pursuant to its contract. San Antonio then made arrangements to purchase gas at a cost of $2.00 per MCF[1] and began a search for alternate fuels. In the course of this investigation, San Antonio asked the petitioners to furnish the approximate cost of hauling coal by unit train from Campbell County, Wyoming, to San Antonio. In November of 1972, the petitioners indicated that a figure of five mills per ton mile could be used for planning purposes. San Antonio continued negotiations among coal producers and carriers. In July, 1973, the petitioners quoted a proposed rate of $7.90 per ton, subject to annual adjustments for changes in their costs, which was reasonably consistent with the five mills per ton mile previously quoted. On March 11, 1974, the petitioners provided a copy of a proposed tariff which set forth this rate. Three days later, the petitioners advised San Antonio that unprecedented cost increases made necessary the submission of new rate quotations. A revised quotation of $11.09 was provided on May 2, 1974. On May 22, 1974, San Antonio entered into twenty-year contracts with Sunedco Coal Company and Amax Coal Company for the supply of coal from mines in Campbell County, Wyoming. At about the same time, San Antonio committed itself to build two coal-fired, 400 mg. electricity generating plants.
 
 
 3
 The petitioners did not file a tariff for the coal movement. Because it was dissatisfied with the applicable class rate,[2] which in this instance was $30 per ton, and the proposed $11.09 rate, San Antonio filed a complaint with the Commission on May 6, 1975, in which it alleged that the rate of $30 per ton was unjust and unreasonable and hence unlawful under § 1(5) of the Interstate Commerce Act. It also alleged that the petitioners' refusal to publish just and reasonable rates and their insistence that San Antonio agree to an adjustment formula violated §§ 1(4), 1(5), 1(6), 2, 3(1) and 6 of the Interstate Commerce Act. It asked the Commission to prescribe a maximum just and reasonable rate.
 
 
 4
 Because of the necessity for an expedited decision, the Commission followed the modified procedure provided by 49 CFR §§ 1100.45-1100.54. In its report and order of October 13, 1976, the Commission found the $30 rate unjust and unreasonable under § 1(5) of the Act, prescribed a maximum reasonable rate of $10.93 per ton and disallowed the adjustment clause.
 
 THE MERITS
 The Unreasonableness of the $30 Rate
 
 5
 Since the Commission's determination respecting the $30 rate was adjudicative in nature, we must decide whether it was supported by substantial evidence. Arizona Grocery Co. v. Atchison, T. & S. F. Ry. Co., 284 U.S. 370, 388-389, 52 S.Ct. 183, 76 L.Ed. 348 (1932).
 
 
 6
 The evidence before the Commission showed that the $30 rate was at least twice that of other rates applicable to coal movements by unit trains, and was more than two and one-half times the $11.09 rate proposed by the petitioners. On this record, there is certainly substantial evidence to support the Commission's determination.
 
 
 7
 The petitioners contend that the Commission violated § 202(b) of the Railroad Revitalization and Regulatory Reform Act of 1976 ("4-R Act"),90 Stat. 31, in finding the $30 rate unjust and unreasonable without first making a finding of market dominance. This contention is without merit. Section 202(b) of the 4-R Act, 49 U.S.C. § 1(5)(b-d), requires that, before the Commission may find a rate to be unjust or unreasonable on the ground that it exceeds a just or reasonable maximum for the service rendered, it must first find that the carrier has market dominance over such service. Section 202(b) further requires the Commission, within 240 days of enactment of the 4-R Act, to establish standards for determining market dominance. Finally, § 202(c),49 U.S.C. § 15(9), provides that, following promulgation of such standards, "the Commission shall . . . within 90 days after the commencement of a proceeding to investigate the lawfulness of such rate, determine whether the carrier proposing such rate has market dominance . . .."
 
 
 8
 It appears from an analysis of these sections that the Commission's duty to make a finding of market dominance before finding a rate to be unjust or unreasonable arises only in proceedings begun after promulgation of the standards required by § 202(b) of the 4-R Act. This proceeding was initiated on May 6, 1975, prior to passage of the 4-R Act, and the standards for determining market dominance were not adopted until September 30, 1976. 49 CFR § 1109.1, 41 Fed.Reg. 44183 (1976). Further, we note that the petitioners at no time sought to invoke these provisions of the 4-R Act before the Commission.
 
 The Reasonableness of the Prescribed Rate
 
 9
 Rate prescription is a product of informal rule-making, 5 U.S.C. §§ 551(4) and 553(c); see Arizona Grocery Co. v. Atchison, T. & S. F. Ry. Co., supra, 284 U.S. at 387-388, 52 S.Ct. 183 and is reviewed under the standards of 5 U.S.C. § 706(2)(A)-(D). Burlington Northern, Inc., et al. v. United States, et al., 549 F.2d 83, at 88 (8th Cir. 1977). Cf. National Ass'n of Food Chains, Inc. v. ICC, 175 U.S.App.D.C. 346, 535 F.2d 1308, 1313 (1976). In the context of this case, the most pertinent of these is the arbitrary and capricious standard.
 
 
 10
 In reviewing the Commission's determination, we are mindful that
 
 
 11
 (t)he process of rate making is essentially empiric. The stuff of the process is fluid and changing the resultant of factors that must be valued as well as weighed. Congress has therefore delegated the enforcement of transportation policy to a permanent expert body and has charged it with the duty of being responsive to the dynamic character of transportation problems.
 
 
 12
 Board of Trade of Kansas City v. United States, 314 U.S. 534, 546, 62 S.Ct. 366, 372, 86 L.Ed. 432 (1942).
 
 
 13
 For this reason, the Commission is given "considerable flexibility" in rate making. Baltimore & O. R. R. Co. v. United States, 345 U.S. 146, 150, 73 S.Ct. 592, 97 L.Ed. 912 (1953); see Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333 (1944).
 
 
 14
 At the same time, however,
 
 
 15
 we * * * have a duty to thoroughly explore the record and carefully examine the Commission's conclusions to determine whether the Commission's findings are supported by the evidence and whether proper legal standards have been applied. See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Warren Transport, Inc. v. United States, 525 F.2d 148, 151 (8th Cir. 1975).
 
 
 16
 Burlington Northern, Inc., et al. v. United States, et al., supra, 549 F.2d 83, at 88.
 
 
 17
 The Commission must "articulate (a) * * * rational connection between the facts found and the choice made." Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962). Only if the Commission does so are we able to determine whether it has exercised a "reasoned discretion." Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 444 F.2d 841, 850, cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971), quoted with approval in Burlington Northern, Inc., et al. v. United States, et al., supra, 549 F.2d 83, at 88; Atchison, T. & S. F. Ry. Co. v. Wichita Board of Trade, 412 U.S. 800, 807, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973).
 
 
 18
 Our scope of review is succinctly summarized by the Court of Appeals for the District of Columbia:
 
 
 19
 We must determine whether the Commission has supplied a rational basis for its order; that is, whether it demonstrably has given reasoned consideration to the issues, and has reached a result which rationally flows from its conclusions.
 
 
 20
 National Ass'n of Food Chains, Inc. v. ICC, supra, at 1315.
 
 
 21
 The reasonableness of the rate charged for a particular movement is principally a question of fact. Illinois Cent. R. R. Co. v. ICC, 206 U.S. 441, 455, 27 S.Ct. 700, 51 L.Ed. 1128 (1907). A rate may be reasonable or unreasonable in relation to cost, in relation to a prescribed rate, in relation to rates on comparable shipments, or "in relation to any other satisfactory standard which permits (the Commission) to measure and determine the factual question presented."[3] Chicago Board of Trade v. Illinois Cent. R. R. Co., 329 I.C.C. 529, 533 (1967).
 
 
 22
 As the Supreme Court stated in Federal Power Commission v. Hope Natural Gas Co., supra, 320 U.S. at 602, 64 S.Ct. at 287.
 
 
 23
 (w)e held in Federal Power Commission v. Natural Gas Pipeline Co., supra (315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037), that the Commission was not bound to the use of any single formula or combination of formulae in determining rates. Its rate-making function, moreover, involves the making of "pragmatic adjustments." Id., p. 586 (62 S.Ct. 736, at page 743). And when the Commission's order is challenged in the courts, the question is whether that order "viewed in its entirety" meets the requirements of the Act.
 
 
 24
 In prescribing the maximum just and reasonable rate for the San Antonio coal movement pursuant to § 15(1) of the Interstate Commerce Act, the Commission considered the following factors: (1) the level of the proposed rate compared with established rates for similar shipments in the territory involved; (2) the economic effect of the proposed rate on the citizens of San Antonio; and (3) the relationship between the proposed rate and the cost of providing the service. The Commission noted that it was charged under the National Transportation Policy to avoid prescribing rates which would be confiscatory and thereby increase the burdens faced by rail carriers. It further emphasized that since the time was approaching when one of San Antonio's coal-powered plants would be completed, it was necessary to enter its order on the basis of the limited written testimony presented to it.
 
 
 25
 In our view, comparative rate data is the strongest evidence in this case to support the Commission's conclusion that the prescribed rate is the maximum reasonable rate. The Commission, when assessing the reasonableness of rates, has consistently
 
 
 26
 given special consideration to comparisons of going rates on the same commodity in the same or similar territories, in relation to distances, revenue per car, car-mile, and ton-mile, variations in traffic density and peculiarities in transportation which affect transportation costs in general.
 
 
 27
 Salt Cases of 1923, 92 I.C.C. 388, 410 (1924).
 
 
 28
 Accord, Big River Industries, Inc. v. Aberdeen & R. R. Co., 329 I.C.C. 539, 544 (1967); Chicago Board of Trade v. Illinois Cent. R. R. Co., supra at 533; Foye v. Atchison, T. & S. F. Ry. Co., 255 I.C.C. 466, 467 (1943). The Supreme Court has approved the practice of considering comparative rates, pointing out, however, that such rates are not a conclusive test of reasonableness. Youngstown Sheet & Tube Co. v. United States, 295 U.S. 476, 480, 55 S.Ct. 822, 79 L.Ed. 1553 (1935).
 
 
 29
 The Commission identified two rates which it considered most comparable to the prescribed rates. These rates covered shipments of coal by unit train from Belle Ayr, Wyoming, to Pueblo, Colorado, and to Amarillo, Texas. The rates are compared in the following chart:
 
 
 30
 Per Mills Rate
 Car Loading Unloading Train Annual -Ton- As
 Miles Ownership Time Time Tons Volume Mile Of
 ----- --------- ------- --------- ------- --------- ----- --------
San Antonio,
 Tex. 1,644 Shipper 4 4-6 10,500- 2,700,000 6.65 10/23/76
 11,000
Pueblo,
 Colo. 595 " 4 6 10,500 1,670,000 6.32 1/76
Amarillo,
 Tex. 943 " 4 6 10,388 750,000 6.54 1/76
 
 
 31
 The comparisons chosen by the Commission were not unfair to the petitioners. As the chart indicates, the territories were the same, the road used for part of the distance was the same, the shippers owned the cars in each case, the loading and unloading times were comparable and the tons carried in each trainload were nearly identical. In addition, the San Antonio rate covers a greater volume of coal over a longer distance, factors which generally reduce a carrier's costs. See e. g., Snyder Chemical Co. v. Atchison, T. & S. F. Ry. Co., 294 I.C.C. 223, 225 (1955); Arkansas-Missouri Plant Food Co. v. Alabama G. S. R. Co., 293 I.C.C. 707, 712 (1954).[4]
 
 
 32
 Our study of the record indicates that other shipments, not mentioned in the Commission's order, are also reasonably comparable and tend to support the Commission's prescription. These shipments, all of which involve shipper-owned cars, are as follows:
 
 
 33
 RATES ON MOVEMENTS OF COAL FROM WESTERN AREAS
 Hours Hours Per Tariff Mills
 Loading Unload- Train Annual Per
 ing
Origin Destinaiton Miles Time Time Tons Volume Ton-Mile
---------- ------------- ----- ------- ------- ------ --------- --------
BURLINGTON
----------
NORTHERN
----------
Belle Ayr, Welsh, Tex. 1,454 4 5 10,290 1,650,000 6.77[5]
 Wyo.
Decker, Austin, 1,617 1,800,000 8.05
 Mt. Tex.
Decker, Superior, 1,029 2,000,000 5.17
 Mt. Wis. (water
 beyond)
 
 
 34
 We turn to the second factor considered by the Commission the economic effect of the proposed rate on the consumers of electricity in San Antonio. It is clear that the Commission gave little or no weight to this factor. The reason is apparent; there simply was no hard evidence to support the contention of either party.
 
 
 35
 Perhaps, as the petitioners argue, the utility could charge its customers less if its contribution to the city in lieu of taxes of $30 million per year were reduced. Perhaps it could reduce the rates still further if it passed on to the consumers the savings that the utility would obtain by using coal rather than the $2.00 per MCF natural gas. But, neither of these circumstances, even if true, would justify the petitioners charging more than a rate which, when judged in terms of other criteria, exceeds the maximum reasonable rate.
 
 
 36
 Undoubtedly, as San Antonio argues, a residential rate of $41.00 per month is a burdensome one for moderate and low income families, but no showing was made here that the residential rates were higher than those in cities of comparable size and economic circumstance, and no showing was made that the balance between residential, commercial and industrial rates had been carefully reviewed. Absent such showing, neither the petitioners nor the electric consumers of other cities should be expected to subsidize the consumers of San Antonio.
 
 
 37
 Finally, we consider the third factor weighed by the Commission in fixing a maximum reasonable rate the relationship between the prescribed rate and the petitioners' cost of providing the service. The Commission explored this relationship in depth and fixed the rate at a level equal to the petitioners' fully allocated costs.
 
 
 38
 In doing so, the Commission performed the following computations. First, after considering cost evidence submitted by both sides, it determined that the petitioners' variable cost[6] for the movement of the San Antonio coal were $8.03. Second, it calculated the petitioners' fully allocated costs[7] of providing the service by diving the variable costs of $8.03 by 0.79. 0.79 is the ratio of the overall average variable costs of all Class I line-haul railroads to the overall average fully allocated costs of all Class I line-haul railroads for the year 1974. This computation produced a figure of $10.16 per ton. Finally, it updated the $10.16 figure to October, 1976 by applying general rate increases of 2.5% and 5%. The final figure was $10.93 per ton, the prescribed rate.
 
 
 39
 The petitioners vigorously dispute the Commission's action of prescribing a rate equal to the amount the Commission determined to be their fully allocated costs. They first contend that the Commission's computation of their variable costs was erroneous. We find no such error.
 
 
 40
 The cost evidence submitted by the petitioners and San Antonio differed significantly with respect to three variables: gross ton mile cost, locomotive capital cost, and plant capacity expansion. The following chart breaks down in dollars per ton the parties' submitted costs for these variables and the Commission's findings on each:
 
 
 41
 Petitioners San Antonio Commission
 ----------------- ----------------- ----------------
GTM Cost 3.742 3.626 3.626
 Capital Cost 1.226 1 .440 2 .440
 ----------------- ----------------- ----------------
 Total 4.968 4.066 4.066
Locomotive Acq. . 717 .240 .240
 Capital Cost .936 3 .264 4 .264
 ----------------- ----------------- ----------------
 Total 1.653 .504 .504
Plant Capacity
Expansion 1.16 - .16
1. Capital cost at 14.8%.
2. Capital cost at 5.2% (Rail Form A[8] average).
3. Capital cost at 15.5%.
4. Capital cost at 8.5% on new road units and 5.2% on existing road units.
 
 Capital Cost Allowances
 
 42
 The Commission in computing the petitioners' GTM cost[9] utilized a 5.2% capital cost figure. In computing new locomotive capital cost it used an 8.5% figure. The petitioners argue that the Commission should have used 14.8% and 15.5%, respectively. They state that the higher figures were necessary to enable them to recover their cost of debt and equity capital, and that the use of the lower rates in computing variable costs was "irrational unsupported, and contrary to the only evidence of record relating to a fair rate of return on railroad investment."
 
 
 43
 The petitioners have not shown on this record that the Commission abused its discretion in using the capital cost percentages of 5.2% and 8.5% to determine variable costs. The former represents the historical system average cost of borrowed capital and the latter reflects the return on recently sold investment trust certificates. Inclusion of the cost of borrowed capital as an element of variable cost is a long-standing Commission practice, see Rules to Govern the Assembling & Presenting of Cost Evidence, 337 I.C.C. 298, 331-332 (1970) ("Cost Evidence"), and nothing in this record supports discontinuance of that practice. Use of the 5.2% rate is open to serious challenge, particularly in light of recent interest rate levels and the large capital expenditures that will be required by railroads generally and for the movement of western coal in particular, but the petitioners have not made the kind of a record here which would permit us to face that challenge squarely. Indeed, they presented no evidence as to the historical cost of their borrowed capital.
 
 
 44
 The exclusion of equity capital as an element of variable costs is also a long-standing Commission practice. Id. It is another practice which is open to challenge. But again, this record is not one that permits us to resolve the issue. Hopefully, the Commission will establish appropriate guidelines when it promulgates standards and procedures for the establishment of revenue levels pursuant to § 205 of the 4-R Act, 49 U.S.C. § 15a(4).[10] Meanwhile, all that we as a reviewing court can do is to examine the ultimate rate prescribed by the Commission on the basis of the record before us and in the light of the arbitrary and capricious standard.
 
 Plant Expansion
 
 45
 The petitioners argued that they would be required to invest approximately $116,000,000 to rehabilitate the line between the mine and San Antonio and that approximately $18,000,000 of that should be allocated to the San Antonio traffic. They estimated that a charge of $1.16 per ton would be required to recover this amount over a 20 year period.
 
 
 46
 San Antonio contended that such expansion costs were reflected in its estimate of roadway maintenance expenses because in calculating those expenses it had used the factors listed in Rail Form A, which include the cost of changes in the railroads' physical plants.
 
 
 47
 The Commission held that the petitioners' inclusion of the $1.16 per ton was improper. It noted that a large part of the expenses would not be incurred until 1980 and that other traffic would benefit from the improvements, making it unfair for San Antonio to bear the entire cost. The Commission concluded that some expense for expansion would be incurred, however, and included $0.16/ton in the prescribed rate to reflect the amount to be expended in 1976.
 
 
 48
 We find that it was not an abuse of discretion to include in variable costs only that portion of plant capacity expenses to be expended in 1976. This result is consistent with the principle that a carrier is not entitled to put an asset into its rate base until that asset is dedicated to public use. Dayton-Goose Creek Ry. v. United States, 263 U.S. 456, 481, 44 S.Ct. 169, 68 L.Ed. 388 (1924). While the Commission's computations are somewhat confusing, the result reached does not appear to be arbitrary, particularly since the Commission has made it clear that it will entertain applications for modifications of the rate as evidence of actual expenditures is obtained.
 
 Acquisition of Locomotives
 
 49
 The petitioners sought $1.653 per ton to cover the cost of purchasing the 67 diesel units required to move the San Antonio coal. This sum would amortize the purchase price over a period of 20 years. Included in the amount to be amortized were the purchase price of the locomotives, $490,000 each, and return of capital at 15.5%.
 
 
 50
 San Antonio estimated locomotive acquisition cost at $ .504 per ton, based upon the expected purchase of 50 diesel units. In computing the cost, the same purchase price and life-of-unit figures were utilized, but return of capital was computed at 8.5%.
 
 
 51
 The Commission adopted San Antonio's computation. We find support in the record for its decision. The major source of dispute was the rate of return. The figure adopted is consistent with comparable industry figures. At the time the rate was prescribed, another railroad the Baltimore & Ohio Railroad offered equipment trust certificates at 8.5%. Moreover, the petitioners' rate for outstanding equipment obligations was 6.37%.
 
 
 52
 In addition, there is evidence in the record to support San Antonio's lower estimate of the number of locomotives needed to handle the coal movement. If more locomotives are required, petitioners may apply for modification.
 
 
 53
 We conclude, therefore, that the Commission did not err in its computation of the petitioners' variable costs.
 
 
 54
 The petitioners next argue that by setting the maximum reasonable rate at the amount of their fully allocated costs, the Commission deviated from its prior established policies and procedures. They claim they are entitled under those policies and procedures to charge a rate in excess of fully allocated costs, and in this way make a sufficient return on equity. They cite several cases where the Commission, in upholding carrier-set rates, held that the fact that rates exceeded fully allocated costs did not establish that they exceeded maximum reasonable levels. See, e. g., General Motors Corp. v. New York Central R. R. Co., 311 I.C.C. 622, 625, aff'd sub nom. General Motors Corp. v. United States, 207 F.Supp. 641 (E.D.Mich.1962), aff'd per curiam, 324 F.2d 604 (6th Cir. 1963); Southeastern Ass'n of R. R. & Util. Comm'rs v. Atchison, T. & S. F. Ry., 321 I.C.C. 519, 545 (1964); Public Service Comm. of N. Dak. v. Great Northern Ry. Co., 340 I.C.C. 739, 750 (1972); Increased Freight Rates and Charges, 1972, 341 I.C.C. 288, 330-331 (1972). They also cite the Commission's statement that
 
 
 55
 Allowances for return on investment * * * to the extent that they are admittedly intended to serve as an encouragement and incentive for continued or new risk-bearing ownership, are in the nature of so-called pure economic profits and should not be taken into account as an element falling within the restrictive construction to be given here to costs. This is not to say, however, that such an allowance for profit is not to be considered as a factor in ratemaking it should, if transportation is to remain under private ownership and control.
 
 
 56
 Cost Evidence, supra, 337 I.C.C. at 393, and that
 
 
 57
 "* * * (I)ncome taxes may be very relevant and an important factor to consider in determining the general level of rates and the revenue needs of carriers."
 
 
 58
 Id. at 394.
 
 
 59
 Finally, they argue that considerable traffic does not move at a rate equal to fully allocated costs because of competition from other modes of transportation. They point to the Commission's own statement that, since many rates are established at less than full cost because of competition, other rates must return more than full cost if the carriers are to earn sufficient revenue to continue to provide service. Public Service Comm. of N. Dak. v. Great Northern Ry. Co., supra, 340 I.C.C. at 750.
 
 
 60
 The petitioners' contend that the maximum reasonable rate should be set at a point in excess of their fully allocated costs is directly related to their contention that variable costs are understated. The substance of both contentions is that the maximum reasonable rate fixed by the Commission is too low; that the rate will not permit them to expand their capacity and modernize their operations.
 
 
 61
 The railroads' right to charge rates which permit them to expand and modernize, and the methods of achieving that goal are currently being considered by the Commission pursuant to Congress' mandate, expressed in § 101 of the 4-R Act, 45 U.S.C. § 801, as follows:
 
 
 62
 Sec. 101(a) Purpose. It is the purpose of the Congress in this Act to provide the means to rehabilitate and maintain the physical facilities, improve the operations and structure, and restore the financial stability of the railway system of the United States, and to promote the revitalization of such railway system, so that this mode of transportation will remain viable in the private sector of the economy and will be able to provide energy-efficient, ecologically compatible transportation services with greater efficiency, effectiveness, and economy * * *.
 
 
 63
 We are unable to adopt at this time the petitioners' argument that they should be entitled to include as part of their variable costs a certain return on capital. It is true that if the formula for computing variable costs were liberalized to permit a greater return on borrowed capital and to allow a return on equity capital, there might not be a need to allow a rate in excess of fully allocated costs. On the other hand, the Commission argues that in the past it has judged a rate's profitability in terms of the amount that rate contributes to the carrier's fixed costs, see Cost Evidence, supra, 337 I.C.C. at 405-406, and that it does not generally consider the rate of return concept in determining the reasonableness of rates.[11] It has cited the importance of the railroads' duty to achieve greater efficiency and improved service as a means of increasing their rate of return, stressing that there should be no government guarantee of a certain rate of return. See, e. g., Net Investment Railroad Rate Base & Rate of Return, 345 I.C.C. 55, 1568 (1976).
 
 
 64
 The issue of the particular methods to be adopted for realization of the goals established by the 4-R Act must first be decided by the Commission. We will note, however, that there is, in our judgment, merit to the petitioners' contention that the purpose of the 4-R Act cannot be met unless the rates for a unit train movement of this size and duration are structured to "stand on their own wheels." Such rates should, absent unusual economic or competitive circumstances, permit the railroad under honest, economic and efficient management to earn sufficient revenue to cover total operating expenses, including depreciation and obsolescence, and a fair, reasonable and economic profit or return (or both) on capital employed in the business. Unless they are so structured, the consumers of one community may end up subsidizing the consumers of another, or the consumers of products other than coal may end up subsidizing coal users. The movement of coal in the years ahead will be too important to permit this to happen unless, of course, such a result is dictated by the Congress.
 
 
 65
 The Commission recognized the need for guidelines with respect to the shipment of coal by unit trains in Ex Parte No. 270, Investigation of Railroad Freight Rate Structure Coal, 345 I.C.C. 71, 533 (1976), and concluded that the rate structures on bituminous coal and lignite from certain western states, including Wyoming, to all points in the United States east of the Rocky Mountains are in need of guidelines regarding the zone of reasonableness. It has announced its intention to institute formal investigation to study the rate structure. The study is not yet underway.
 
 
 66
 We are left then, as we have heretofore indicated, with the necessity of reviewing, pursuant to the arbitrary and capricious standard, the Commission's finding that the rate prescribed is reasonable when judged according to certain commonly used criteria of reasonableness. When we do so, we find that the Commission's action meets that test:
 
 
 67
 The rate fixed is comparable to rates for other similar movements of coal by unit trains from western coal mines to points east of the Rocky Mountains.
 
 
 68
 The rate will return the petitioners their variable costs, as computed by the Commission, plus a sum in excess of $8.5 million per year, a sum which can be applied towards the petitioners' constant cost and perhaps their profit.
 
 
 69
 The rate is a temporary one, developed to meet an emergency situation. It can be modified on application to the Commission both before and after the new guidelines are developed and if circumstances warrant.
 
 
 70
 Finally, less there be a misunderstanding, we emphasize that our denial of the petition is not intended to serve as an affirmance of the formula used by the Commission to establish the rate. It is only intended to approve the result for the reasons stated.[12]
 
 
 71
 The petition is denied.
 
 
 
 [1]
 In the period from 1972 to 1975, the average residential customer's electric bill increased from $20.59 to $41.69 due to increased natural gas prices
 
 
 [2]
 The class rate is the rate at which goods of a particular type move absent the filing of a tariff setting forth a different rate. See Westinghouse Electric Corp. v. United States, 388 F.Supp. 1309, 1311 (W.D.Pa.1975)
 
 
 [3]
 The court in Westinghouse Electric Corp. v. U. S., 388 F.Supp. 1309, 1317 (W.D.Pa.1975), sets forth some of the many variables which may be considered in the process of assessing the reasonableness of rates; they include cost of service, value of service, the existence vel non of competition, the transportation characteristics of the commodity (weight, size, density), the anticipated volume of shipments, the distance of the haul, the availability of return loads in the type of equipment used, the economic status of the industry served, the rate level required in order to move the traffic, and comparison of the rate under consideration with established rates for comparable shipments in the territory involved
 
 
 [4]
 The petitioners claim that the rates are depressed ones negotiated in the face of vigorous competition. The Commission found no support for that claim in the record, and none has been pointed out to us
 
 
 [5]
 The Welsh, Texas rate came before the Commission pursuant to special permission, Application No. 264, by the Burlington Northern three days before the Commission's order prescribing the $10.93 rate. It would appear that the movement, which is as comparable to the San Antonio movement as the Pueblo and Amarillo movements, was not considered by the Commission
 RATES ON MOVEMENTS OF COAL FROM WESTERN AREAS
 Hours Hours Per Tariff Mills
 Loading Unloadi- Train Annual Per
 ng
Origin Destination Miles Time Time Tons Volume Ton-Mile
---------- ------------ ----- ------- -------- ------ --------- --------
Kuehn, Mt. Same 796 2,000,000 6.68
Colstrip, Same 773 2,000,000 6.88
 Mt.
Belle Ayr, Amsterdam, 783 4 5 10,500 1,600,000 9.04
 Wyo. Mo.
UNION
----------
PACIFIC
----------
Dana, Wyo. Kansas City, 765 9,000 800,000 5.53
 Mo.
 500,000 7.29
 300,000 9.66
 4 10 800,000 4.89
 4 10 500,000 6.46
 4 10 300,000 8.55
Hanna, Sgt. Bluff, 698 4 1/2 5-9 1,100,000 5.60
 Wyo. Ia.
Dana, Wyo. Oak Creek, 1,165 4 6 11,000 750,000 5.92
 Wis. --------
 AVERAGE 6.89
 --------
 
 
 [6]
 The term "variable costs" is defined as "Unit-costs of output which change with changes in the volume of output." Rules to Govern Assembling & Presenting Cost Evidence, 337 I.C.C. 298, 428 (1970). Fourteen separate variables were considered in determining petitioners' variable costs; these were: GTM (gross ton mile), locomotive unit mile, crew, train mile, inspection, train supplies and expenses, switching, carload claims, clerical, station clerical, loss and damage, helper service, locomotive capital, and caboose capital
 
 
 [7]
 The term "fully allocated costs" is defined as "that level of expenses which represents the sum of the 'variable costs' plus an appropriate allocation of fixed expenses, i. e., an allocation which assigns an adequate portion of fixed expenses to the movement of traffic on which the rate in issue applies." Cost Evidence, supra, 337 I.C.C. at 308. The term "fully allocated costs" does not include elements of profit and income tax. Id
 
 
 [8]
 Rail Form A is a formula developed by the Commission's cost-finding section to determine rail freight service costs for classes of railroads
 
 
 [9]
 The major components of gross ton mile cost are: roadway maintenance and diesel fuel, servicing and repairs considered a function of gross ton miles, and return on investment in the variable portion of the roadway plant, e. g., track, ties, ballast, land, etc
 
 
 [10]
 § 205 provides in pertinent part as follows:
 With respect to common carriers by railroad, the Commission shall, within 24 months after the date of enactment of this paragraph, after notice and an opportunity for a hearing, develop and promulgate (and thereafter revise and maintain) reasonable standards and procedures for the establishment of revenue levels adequate under honest, economical, and efficient management to cover total operating expenses, including depreciation and obsolescence, plus a fair, reasonable, and economic profit or return (or both) on capital employed in the business. Such revenue levels should (a) provide a flow of net income plus depreciation adequate to support prudent capital outlays, assure the repayment of a reasonable level of debt, permit the raising of needed equity capital, and cover the effects of inflation and (b) insure retention and attraction of capital in amounts adequate to provide a sound transportation system in the United States. The Commission shall make an adequate and continuing effort to assist such carriers in attaining such revenue levels. No rate of a common carrier by railroad shall be held up to a particular level to protect the traffic of any other carrier or mode of transportation, unless the Commission finds that such rate reduces or would reduce the going concern value of the carrier charging the rate.
 
 
 [11]
 In Net Investment Railroad Rate Base & Rate of Return, 345 I.C.C. 55, 60-61 (1974), the Commission stated:
 With the possible exception of oil pipelines, this Commission, unlike some other Commissions, does not prescribe or approve rates based solely on a rate of return concept. The adequacy of the railroad rate of return, in recent years the inadequacy of the railroad rate of return, has not been the determining factor in the Commission's consideration of railroad general increase proposals. The primary factor considered by the Commission in railroad general increase proceedings has historically been "a revenue need" rather than a specific need for a definite rate of return. Similarly, when considering whether a particular rate is reasonable or unreasonable, the Commission has not generally given consideration to the rate of return concept but has given consideration to the following factors, in addition to others: volume of traffic, density of traffic, length of haul, cost of service, value of service, raw or finished state of the commodity, carrier liability (loss or damage experience), shippers' commercial needs, market competition, and carrier competition. (Emphasis added.)
 
 
 [12]
 The petitioners also alleged that the Commission erred in using the .79 ratio to determine their fully allocated costs and in updating the petitioners' fully allocated costs to current cost levels. Because our concern is with the ultimate result with whether the rate prescribed is the maximum reasonable rate rather than with the method utilized by the Commission in determining the petitioners' fully allocated costs, we need not discuss the propriety of the ratio figure used or the method of updating costs. We note that the petitioners did not have the opportunity to present this allegation of error to the Commission, since, due to the time factors involved, no recommended decision was given. Should the petitioners seek modification of the prescribed rate, they may present these allegations to the Commission at that time. The same holds true with respect to the Commission's refusal to permit application of the petitioners' adjustment formula