NEW ORLEANS & LOWER COAST RAILROAD CO.

v.

INTERNATIONAL PROTEINS CORPO-RATION, Petrou Fisheries.

INTERNATIONAL PROTEINS CORP., et al.

v.

INTERSTATE COMMERCE COMMIS-SION, United States of America.

Civ. A. Nos. 75–1849, 77–813.

United States District Court, E. D. Louisiana.

Feb. 17, 1981.

Memorandum and Opinion May 8, 1981.

William J. Augello, Augello, Pezold & Hirschman, Huntington, N. Y., J. David Forsyth, Sessions, Fishman, Rosenson, Boisfontaine & Nathan, New Orleans, La., for plaintiffs.

Charles A. Stark, I. C. C., Washington, D. C., for defendant.

John J. Paylor, Cleveland, Ohio, for The Baltimore & Ohio Railroad Company, intervenor.

John A. Daily, Philadelphia, Pa., for Penn Central Transportation Company, intervenor.

Robert H. Stahlheber, St. Louis, Mo., for Missouri Pacific Railroad Company and New Orleans & Lower Coast Railroad Company, intervenors.

Esmond Phelps, II, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for all intervenors.

## MEMORANDUM OPINION AND ORDER

EDWARD J. BOYLE, Sr., District Judge:

This consolidated action arose out of an order of the Interstate Commerce Commission (Commission), by Division 2, in a proceeding entitled *International Proteins Corporation, et al v. The Baltimore and Ohio Railroad Company, et al*, Docket No. 36047, 355 I.C.C. 137 (August 20, 1976). The New Orleans & Lower Coast Railroad Company, in No. 75–1849, seeks enforcement of the Commission's order. International Proteins Corporation (IPC) and its subsidiaries, Atlantic Shippers of Baltimore and Petrou Fisheries, in No. 77–813, ask us to set aside the order. The New Orleans & Lower Coast Railroad and other concerned railroads have intervened in this second case. The controversy concerns the charges assessed by the railroad for the shipment of fifty-two carloads of watersoaked fishmeal owned by IPC. The Commission found that the railroads were entitled to $111,728 in

total charges for this shipment. By virtue of 28 U.S.C. § 1336(a), this court has jurisdiction to enforce, enjoin or suspend, in whole or in part, this order of the Commission. The parties have cross-moved for summary judgment in No. 77–813. The case was submitted for adjudication on the administrative record and supporting legal memoranda. For the following reasons, we grant the motions in part and deny same in part and remand the case to the Commission for further proceedings consistent with this opinion.

## I. THE FACTUAL BACKGROUND

The facts are not in dispute. In August, 1972, a six-alarm fire broke out in the warehouse of plaintiff Atlantic Shippers of Baltimore, Inc., at Canton, Maryland. Firefighters poured tons of water into the building; and the fishmeal within the building became soaked. Plaintiff IPC purchased the damaged fishmeal, in an effort to salvage it, for a price of $421,561.44. IPC decided to transport the wet fishmeal via the intervening railroads to the plant of plaintiff Petrou Fisheries, Inc. in Empire, Louisiana for processing.

Wet fishmeal is highly combustible and the rail shipment presented special problems. Pursuant to Department of Transportation hazardous materials regulations, the wet fishmeal had to be shipped in open-top cars instead of closed boxcars. Moreover, a special permit had to be obtained to make this shipment. Once in transit, the railroads began to receive complaints of the meal's highly noxious odor from individuals in communities through which the train transporting the wet fishmeal passed.

The first four of the fifty-two cars transporting the fishmeal arrived and were unloaded in Empire where Petrou employees processed the shipment. However, plaintiffs were prevented from unloading the remaining forty-eight cars by an order of the Plaquemines Parish Board of Health. The Board of Health, noting that it had received numerous complaints that odors from the shipment had caused vomiting and nausea, and that employees of the nearby Gulf Oil Company had threatened to walk off their jobs due to the odor, ordered the entire shipment removed from the parish within five days. The plaintiffs complied with this order, and had the fishmeal transported to Port Arthur, Texas, for destruction.

The railroads originally billed plaintiffs on the basis of the column commodity rate [1] that applies for transportation of fishmeal in closed-topped cars. This rate amounted to $19.57 per net ton plus a 2.5% surcharge, a total of approximately $20.06 per net ton. The railroads, claiming that the column commodity rate only applied to shipments in closed-topped cars, rebilled plaintiffs on the basis of a class rate.[2] The class rate was $2.49 per hundred pounds plus a 2.5% surcharge, a total of approximately $51.05 per net ton. The railroads applied this higher rate to the full origin track scale weight of the moisture laden shipment, and determined a total line haul charge of $145,-378 (based on 5,684,782 pounds hauled).

Additionally, the railroads assessed demurrage charges of $10,260. Demurrage is a charge rail carriers impose upon shippers and receivers for the detention of freight cars beyond an allotted free time period for loading and unloading. A total of 694 car days elapsed before plaintiffs returned the cars to the railroads. The demurrage charges and the line haul charges resulted in a total bill to plaintiffs of $155,638.

1. Commodity rates are special rates established for particular commodities. *New York v. United States*, 331 U.S. 284, 290 n.3, 67 S.Ct. 1207, 1210 n.3, 91 L.Ed. 1492 (1947).

2. Class rates are rates at which goods of a particular type move absent the filing of a tariff setting forth a different rate. *Burlington Northern, Inc. v. United States*, 555 F.2d 637, 639 n.2 (8th Cir. 1977). Class rates are infrequently used for billing purposes and are often referred to as "paper rates." They must be available, however, so that a carrier will be able to charge a legal published tariff rate for any sort of unusual shipment that might be tendered to it. *Westinghouse Electric Corp. v. United States*, 388 F.Supp. 1309, 1311 (W.D.Pa. 1975).

The plaintiffs paid the railroads $41,836. Instead of paying the balance of the $155,-638, the plaintiffs filed a complaint with the Commission. They alleged that the rate charged by the railroads for transporting the damaged fishmeal was unjust and unreasonable, in violation of section one of the Interstate Commerce Act, 49 U.S.C. § 10701(a). Plaintiffs asked the Commission to prescribe a lower rate for the line haul charges and to waive the penalty portion of the demurrage charges.

The Commission received evidence in the case according to its "modified procedure," 49 C.F.R. §§ 1100.43–52, under which the agency decides a case on written submissions instead of holding an oral hearing. Administrative Law Judge Allard, in the Commission's initial decision, agreed with the plaintiffs that the $51.05 per ton class rate was unjust and unreasonable as applied to the total weight of the shipment. Applying the rationale of *Millhurst Milling & Drying Co., Inc. v. Boston & Maine Railroad Co.*, 299 I.C.C. 674 (1957), the ALJ granted plaintiffs a reduced rate on the excess water portion of the shipment. However, he applied the full $51.05 per ton class rate to the normal or dry weight of the fishmeal, resulting in total line haul charges of $101,468. Waiver of any portion of the demurrage charges was denied.

In subsequent administrative proceedings, the Commission affirmed the ALJ's decision. Thus, according to the Commission's order, plaintiffs owe $111,728 in total charges. Dissatisfied with this order, plaintiffs now ask us to review the Commission's decision.

## II. THE APPLICABLE LAW

█ By virtue of section 1(4) of the Interstate Commerce Act (Act), 49 U.S.C.A. § 10701(a) (1979), all rates charged by common carriers must be reasonable. A carrier may charge only those rates that are specified in its published tariffs. *Id.* § 10761(a). The tariff rate is known as the *legal* rate; that is, the rate which must be charged to all shippers alike. However, the legal tariff rate is not always a *lawful* rate, because rates must be reasonable to be lawful. The exaction of unreasonable rates was forbidden at common law. The Act created the legal rate, but retained the common law duty to charge no more than a reasonable rate. The Act altered the common law only by vesting in the Commission, rather than the courts, the power to determine the reasonableness of a published rate. *Arizona Grocery Co. v. Atchison, T. & S. F. Ry. Co.*, 284 U.S. 370, 384, 52 S.Ct. 183, 184, 76 L.Ed. 348 (1932). Sections 8 and 9 of the Act, 49 U.S.C.A. § 11705(b)(2) and (c)(1), authorize any person to make a complaint to the Commission to seek relief from an unreasonable rate. The complainant bears the burden of proving the alleged unreasonableness. *Swift & Co. v. United States*, 343 U.S. 373, 382, 72 S.Ct. 716, 721, 96 L.Ed. 1008 (1952).

█ In its evaluations of complaints alleging unreasonableness of line haul rates, the Commission has applied many customary criteria including, *inter alia*,

cost of service (car-mile costs and revenue are frequently examined in this connection); value of service (what the traffic will bear); the existence *vel non* of competition; the transportation characteristics of the commodity (weight size, density; gold vs. feathers is an example often used as an illustration by rate economists; likewise sand and gravel vs. perishable fruit or vegetables); the anticipated volume of shipments; the distance of the haul; the availability of return loads in the type of equipment used; the economic status of the industry served; the rate level required in order to move the traffic; comparison of the rate under consideration with established rates for comparable shipments in the territory involved; and other pertinent considerations.

*Westinghouse Electric Corp. v. United States*, 388 F.Supp. 1309, 1317 (W.D.Pa. 1975). However, the Commission is not bound to employ any single formula or combination of formulas. Agencies to whom rate-making power has been delegated "are free, within the ambit of their statutory authority, to make the pragmatic adjust-

ments which may be called for by particular circumstances." *FPC v. Natural Gas Pipeline Co.,* 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037 (1942). There is at least a presumption, though, that the Commission will adhere to its settled standards. The agency is not bound by its previous standards and may flatly repudiate them, but if it does the reasons for the change must be clearly set forth so that a reviewing court may understand and evaluate the basis of the agency's action. *Atchison, T. & S. F. Ry. Co. v. Wichita Board of Trade,* 412 U.S. 800, 808, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973) (plurality opinion).

Judicial review of Commission rate decisions is limited in scope. The agency's decisions will not be disturbed by the courts except upon a showing that they are unsupported by substantial evidence, were made without a hearing, exceed constitutional or statutory limits, or are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2) (1976); *Atchison, T. & S. F. Ry. Co. v. Wichita Board of Trade,* 412 U.S. at 806, 93 S.Ct. at 2374, *quoting Manufacturers R. Co. v. United States,* 246 U.S. 457, 481, 38 S.Ct. 383, 389, 62 L.Ed. 831 (1918). However, "a court reviewing a Commission decision must be able to discern from the decision the reasons for the Commission's conclusions and the policies it is pursuing." *Potomac Electric Co. v. United States,* 584 F.2d 1058, 1062 (D.C.Cir.1978). Although the agency's written opinion need not be a "model of clarity," *Morton v. Dow,* 525 F.2d 1302, 1307 (10th Cir. 1975), and it is not necessary that the agency "dot all 'i's' and cross all 't's,'" *ASG Industries, Inc. v. Consumer Product Safety Comm'n,* 593 F.2d 1323, 1329 (D.C.Cir.1979), the agency must set forth clearly the grounds on which it acted. *Atchison,* 412 U.S. at 807, 93 S.Ct. at 2374. *Accord, SEC v. Chenery Corp.,* 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). For "[w]e must know what a decision means before the duty becomes ours to say whether it is right or wrong." *Id., quoting United States v. Chicago M., St. P. & P. R. Co.,* 294 U.S. 499, 511, 55 S.Ct. 462, 467, 79 L.Ed. 1023 (1935).

The requirement that the agency set forth the basis for its decisions serves two purposes. First, it allows the losing party the satisfaction of knowing why he lost his case, and, more importantly, it allows for thoughtful and orderly judicial review. *Harborlite Corp. v. ICC,* 613 F.2d 1088, 1092, 1092 n.7 (D.C.Cir.1979). Finally, we note that the Commission's order must be upheld, if at all, on the same basis articulated in the order itself; we cannot accept "appellate counsel's *post hoc* rationalizations." *FPC v. Texaco, Inc.,* 417 U.S. 380, 397, 94 S.Ct. 2315, 2326, 41 L.Ed.2d 141 (1974), *quoting Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168–69, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962).

## III. THE COMMISSION'S TREATMENT OF THE LINE HAUL CHARGES ISSUE

The ALJ's discussion of the line haul charges issue begins with a review of earlier Commission decisions involving distressed, water-soaked commodities. *See* Record Doc. No. 13, Exhibit 4, at 6 [hereinafter cited as Initial Decision]. The ALJ noted that, in several of these cases, the Commission found it unreasonable for the shipper to have to pay the applicable rate on the total weight of the shipment. *Id.* at 6–7. He relied heavily on *Millhurst Milling & Drying Co., Inc. v. Boston & Maine Railroad Co.,* supra, observing that the "facts in the instant case are similar to those in *Millhurst.*" Initial Decision at 7. In *Millhurst,* the carrier transported forty-seven carloads of water-damaged grain. Because the wet grain was highly combustible, the shipment was made in open-top cars rather than the usual boxcars. 299 I.C.C. at 675. After carefully analyzing the relevant factors, the Commission held that the applicable rate was reasonable as applied to the actual weight of the shipment less the excess moisture content but unreasonable as applied to the weight of the excess moisture. A lower rate was therefore prescribed for the excess moisture portion of the shipment. *Id.* at 677. The Commission followed similar rationale in *Missouri Bag*

*Co. v. Southern Ry. Co.*, 243 I.C.C. 282 (1941). The Commission there applied the applicable rate to the dry weight of the shipment, and a lower rate to the weight of the excess moisture.

▪ Applying the rationale of these earlier cases to the present controversy, Judge Allard found that the legal rate was reasonable as applied to the normal dry weight of the fishmeal, but unreasonable as applied to the excess moisture portion of the shipment. He did not state any reasons whatsoever for his conclusion that the legal class rate was reasonable as applied to the dry weight of the shipment. It is for this reason that we feel compelled to vacate the Commission's order and to remand this portion of the case.

In both *Missouri Bag* and *Millhurst*, it was uncontested that the applicable legal rate should apply to the dry weight of the shipments. The complainant in *Missouri Bag* agreed to pay the applicable rate on the dry weight of the shipment, "plus whatever the Commission in its judgment may deem reasonable" for the weight of the excess moisture. 243 I.C.C. at 283. In *Millhurst*, the complainant asked that it be required to pay charges based on the applicable charges on the dry rate of the shipment. 299 I.C.C. at 676.[3] This, plus an additional charge for carrying the excess water, is exactly what the Commission ordered. *Id.* at 677.

Plaintiffs in this case, unlike the *Millhurst* complainants, strenuously asserted to the Commission that the legal class rate was unreasonable even if applied only to the dry weight of the shipment. *See* Record Document No. 13, Exhibit 3A, at 1–2. In view of the fact that class rates "move but a small percentage of the traffic," *New York v. United States*, 331 U.S. 284, 343, 67

S.Ct. 1207, 1238, 91 L.Ed. 1492 (1947), and are often regarded as mere "paper rates," *Westinghouse Electric Corp. v. United States*, 388 F.Supp. 1309, 1311 (W.D.Pa. 1975), we believe that the Commission should explain its reasons for applying the class rate. The class rate is more than double the normal rate for shipments of fishmeal, and this rate is applicable only because the shipment was made in open-topped cars rather than boxcars. Nevertheless, "the traditional tests of reasonableness were not applied and the pertinent factors considered and evaluated; the class rate level was swallowed at a gulp without chewing." *Westinghouse*, 388 F.Supp. at 1318. The sole basis for the Commission's decision is the *Millhurst* decision and the other similar decisions. While the Commission is free to "articulate the basis of its order by reference to other decisions," *Atchison*, 412 U.S. at 807, 93 S.Ct. at 2375, quoting *NLRB v. Metropolitan Life Insurance Co.*, 380 U.S. 438, 443 n.6, 85 S.Ct. 1061, 1064, 13 L.Ed.2d 951 (1965), none of the decisions cited by Judge Allard sheds any light whatsoever on the question of the reasonableness of the rate to be applied to the dry weight of the shipment, because in none of these cases was this underlying rate at issue.

We do not imply that the Commission, on the facts before it, had to find that the class rate was unreasonable. That question is for the Commission to determine. It is also for the Commission to determine if plaintiffs' evidence was submitted timely. Defendants, Record Doc. No. 16, at 11–15, and Intervenors, Record Doc. No. 15, at 8–14, in their briefs attempt to establish grounds upon which the Commission could have found against plaintiffs even if all challenged evidence[4] had been fully con-

---

**3.** Unlike the present case, in *Millhurst* the legal rate did not change simply because the commodity was shipped in open-top cars rather than boxcars.

**4.** The evidentiary dispute concerns the admissibility of plaintiffs' evidence as to defendants' costs of transporting the fishmeal, and defendants' rates for transportation of allegedly comparable "feed tankage." Plaintiffs submitted

the cost evidence in its reply statement, despite the fact that the Commission's procedural rules limit the reply to "rebuttal of the defendant's statement." Rule 47, 49 C.F.R. § 1100.47. Plaintiffs apparently did not introduce the "feed tankage" data until after the ALJ had rendered his decision, despite the Commission's Rule 84, 49 C.F.R. § 1100.84, which states that the Commission will not receive in

sidered.[5] "Had the order unambiguously provided what the Commission now asserts it was intended to provide, we would have a far different case to decide. But as it is, we cannot 'accept appellate counsel's *post hoc* rationalizations for agency action.'" *FPC v. Texaco, Inc.*, 417 U.S. at 397, 94 S.Ct. at 2326, *quoting Burlington Truck Lines, Inc. v. United States*, 371 U.S. at 168–69, 83 S.Ct. at 246. *See also NLRB v. Gibson Products Co.*, 494 F.2d 762, 767 n.9 (5th Cir. 1974).

On remand, the Commission may, of course, evaluate plaintiffs' contention that the underlying class rate is unreasonable by means of its traditional standards. However, as mentioned above, the Commission is also free to flatly repudiate its previous tests and devise new ones, as long as the departure from prior norms is adequately explained. *Atchison, T. & S. F. Railway Co. v. Wichita Board of Trade*, 412 U.S. at 808, 93 S.Ct. at 2375. All that is necessary is that the agency's order articulate some rational basis for the rejection of plaintiffs' contention that the underlying class rate is unreasonable.

## IV. THE COMMISSION'S TREATMENT OF THE DEMURRAGE CHARGES ISSUE

As noted above, demurrage is a charge rail carriers impose upon shippers and receivers for the detention of freight cars beyond a certain allotted free time period for loading and unloading. *Baltimore & O.C.T.R. Co. v. United States*, 583 F.2d 678, 681 n.3 (3rd Cir. 1978). Demurrage charges have a double purpose. One is to secure compensation for the use of the car and the track which it occupies. The other is to promote prompt return of cars by providing a deterrent against undue detention. *Turner, Dennis & Lowry Lumber Co. v. Chicago,*

*M. & St. P. Ry. Co.*, 271 U.S. 259, 262, 46 S.Ct. 530, 531, 70 L.Ed. 934 (1926).

In the proceedings before the Commission plaintiffs sought waiver of the penalty element of the demurrage charges, on the theory that the car detention was caused by circumstances beyond their control. They argued that the order of the Plaquemines Parish Board of Health prevented them from unloading the cars. The railroads answered by suggesting that if the Board of Health had not intervened, demurrage charges would have been greater than the $10,260 that actually accrued. They introduced evidence to establish that, due to the limited capacity of plaintiffs' processing plant, over $18,000 in demurrage charges would have accrued had processing been permitted. The railroads contended that it was therefore plaintiffs' lack of due diligence in sending all fifty-two cars to the plant at once, rather than the intervention of the Board of Health, that caused the demurrage to accrue. Plaintiffs responded by claiming that, had the Board of Health not intervened, the plant would have been operated around-the-clock to process the fishmeal and return the cars. Thus, they contended that the railroads' calculation that over $18,000 in demurrage would have accrued was erroneous, because the calculation was based on the assumption that the plant would operate only eight hours daily. However, plaintiffs did not offer any calculations of their own as to how much demurrage would have accrued if the Board of Health had not intervened.

The Commission has long held that applicable penalty charges are unreasonable when they accrue due to circumstances beyond the complainant's control. *See Commerce & Industry Ass'n v. Baltimore & Ohio Railroad*, 272 I.C.C. 7, 9 (1948),

---

evidence any information submitted after the close of the hearing. In Rule 84, however, the Commission reserves to itself the right to consider untimely submitted evidence "in a particular instance." We think it is well within the Commission's discretion to accept or reject plaintiffs' late submissions.

**5.** Of course, the Commission may also have found against plaintiffs because it erroneously felt that *Millhurst* compelled this conclusion. This demonstrates the wisdom of the Supreme Court in requiring that agencies clearly set forth the grounds for their decisions. Otherwise, there would be no way to determine whether decisions were based on rational grounds or on some untenable ground.

*modified* 281 I.C.C. 655 (1951); *Chrysler Corp. v. New York Central Railroad,* 234 I.C.C. 755 (1939).[6] The Commission has consistently denied relief, though, in instances where the complainant failed to exercise due diligence in shipping its goods, or where the proximate cause of the car detention was found to be of the complainant's own making. *Ormet Corp. v. Illinois Central Railroad,* 341 I.C.C. 647 (1972).

In the present controversy, Administrative Law Judge Allard applied the above law in the following manner:

> [T]he proximate cause of the car detention was not the order of the Plaquemines Parish Health Department but complainants' decision to ship 52 carloads of distressed fishmeal to a processing plant that could handle only 4 carloads in 32 hours, 40 minutes. . . . Even if the Health Department had not intervened and complainants had processed the meal on an around-the-clock basis, substantial demurrage would have accrued. . . . Therefore, once having embarked on the venture, detention of the cars was bound to occur. As a result, the evidence of record is not persuasive that the complainant exercised due diligence in avoiding detention of the cars upon which the demurrage accrued.

Initial Decision at 8.

In a real sense, the plaintiffs' failure to exercise due diligence by sending all cars at once was not even a cause-in-fact of the demurrage, let alone a proximate cause.[7] An act is not considered a cause of an event if the event would have occurred without it. An act is only considered a cause-in-fact of an event if the event would not have occurred "but for" the act. W. Prosser, *Handbook of the Law of Torts* 238–39 (4th ed. 1971). If a person hurls a rock at a glass window and a bolt of lightning shatters the glass before the rock reaches the glass, the rock hurler cannot be said to have caused the glass to break, even though breakage of the glass was "bound to occur" once he had "embarked" on the rock-throwing "venture."

■ This does not mean that the plaintiffs' failure to exercise due diligence is of no moment. Shippers are strictly liable for demurrage charges; liability attaches even if they have not caused the delay themselves. *Port Terminal Railroad Ass'n v. Connell, Rice & Sugar Co.,* 387 F.2d 355, 357 (5th Cir. 1967) (per curiam). Strictly on equitable grounds, however, when a reasonable assessment "becomes unreasonable in its application," *Chrysler Corp. v. New York Central R. Co.,* 234 I.C.C. at 761, the Commission in certain instances has waived the penalty portion of these charges. These equitable considerations are not present when the shipper has not exercised the requisite due diligence to perform his duty to release the cars in time. Justice does not

---

**6.** Cases such as these, in which the Commission found *applicable* demurrage charges *unreasonable* because they accrued due to circumstances beyond the complainant's control, must be carefully distinguished from cases in which the charges were found *inapplicable* due to *vis major. See, e.g., Chicago, B. & Q. R. Co. v. Edward Hines Lumber Co.,* 320 F.Supp. 194, 196 (D.C.Ill.1970); *Southern R. Co. v. White,* 284 F. 560 (6th Cir. 1922). *See also Pennsylvania Railroad v. Moore-McCormack Lines, Inc.,* 370 F.2d 430, 432 (2d Cir. 1966). The distinction is important because if it is alleged that the charges are inapplicable, the inquiry concerns the *construction,* rather than the reasonableness, of the tariff. *Union Pacific Railroad v. United States,* 490 F.2d 1385, 1387–91, 203 Ct.Cl. 368 (1974). The construction of a tariff is a question of law, and questions of law "are freely reviewable by the courts; the courts are under no obligation to defer to ICC legal con-

clusions." *Coca-Cola v. Atchison, T. & S. F. Ry. Co.,* 608 F.2d 213, 218–219 (5th Cir. 1979). In contrast, the reasonableness of a tariff is a question of fact, *Illinois Central Railroad v. ICC,* 206 U.S. 441, 459, 27 S.Ct. 700, 706, 51 L.Ed. 1128 (1907), and as such the agency's determination will not be disturbed unless it is shown to be arbitrary, capricious, or not supported by substantial evidence. *Atchison,* supra, 412 U.S. at 806, 93 S.Ct. at 2374.

**7.** A proximate cause is merely a cause-in-fact that gives rise to legal responsibility. In a philosophical sense, the consequences of an act go forward to eternity. As a practical matter, legal responsibility is limited to those causes which are of such significance that the law is justified in imposing liability. W. Prosser, *Handbook of the Law of Torts* 236–37 (4th ed. 1971).

dictate that he be excused from paying the charges. To hold otherwise would allow the negligent shipper to reap a windfall profit when a third force intervenes to cause the same detention that was bound to occur anyway due to the negligence.

A far more difficult question is presented if, due to the shipper's lack of due diligence, some demurrage was bound to accrue, but, due to an independent[8] intervening force, more demurrage accrues than what would have accrued had events proceeded normally. The Commission was faced with this problem in two of its previous decisions, and the results are inconsistent. In *Davison Chemical Co. v. New York Central Railroad*, 296 I.C.C. 744 (1955), *rev'd* 298 I.C.C. 191 (1956), the complainant's plant was rendered inoperative by the collapse of a floor of the plant. The collapse caused plaintiffs to delay the return of defendant railroad's cars, and demurrage charges accrued. Complainant contended that the collapse of its building was a circumstance beyond its control and asked for a waiver of the penalty portion of the demurrage charges. Defendant responded that complainant's unloading performance prior to the accident indicated that "some" demurrage would have resulted even if the accident had not occurred. Complainant did not deny this, but asserted that the charges would have been "materially less" than those that actually accrued. The Commission, by Division 3, originally held that the demurrage accrued due to forces beyond the control of complainant and granted the requested relief. For some unarticulated reason, the commissioners did not even require complainant to pay for the demurrage that concededly would have accrued even if the accident had not occurred.

On reconsideration, the Commission, again by Division 3, reversed itself and held that the collapse of the building was not beyond complainant's control in the sense in which the Commission had previously used the phrase. The complaint was thus dismissed.

In *General Products Co., Inc. v. New York, N.H. & H.R. Co.*, 288 I.C.C. 439 (1953), a fire in the complainant's plant prevented it from returning defendant's tank cars until considerable demurrage had accrued. The Commission denied relief because, at the time of the fire, complainant's storage tanks were almost full and it was "clear that at least some, if not most, of this detention would have resulted" anyway, because complainant would not have had sufficient room to store the contents of the cars. 288 I.C.C. at 442.

In cases such as these, the most logical way to resolve the matter would be to require the shipper to pay the difference between the amount of demurrage that actually accrued and the amount of demurrage that would have accrued in any event due to the shipper's failure to exercise due diligence. Thus, if $10,000 in demurrage charges accrued due to the intervention of an uncontrollable force, but $3,000 would have accrued in any event due to the shipper's failure to exercise due diligence, then the shipper should be required to pay $7,000. Yet in both *General Products* and the present case, the Commission ruled that because *some* demurrage would have accrued in any event, the shippers were liable for *all* demurrage that did in fact accrue. The Commission's formula, if not limited in some fashion, could lead to extremely harsh results. Under this formula, if millions of dollars in demurrage charges accrue due to the intervention of an uncontrollable force, the shipper is liable for it all even if only a few thousand dollars in charges would have accrued in any event. Such a result is arguably unlawful as an arbitrary and capricious exercise of the Commission's discretion. On the other hand, the formula is arguably rational as an application of the equitable "clean hands" doctrine, even

8. The problem only arises if the intervening force comes to bear completely independent from the actions of the complainant. Thus, in this case, if the plaintiffs' lack of diligence somehow caused the Board of Health to take the action it did, then plaintiffs are unquestionably liable for all demurrage that accrued. The Commission did not make a finding on this point.

though it has long been recognized that this doctrine must be tempered by sound discretion to avoid injustice in individual cases. *See generally*, Note, 60 Harv.L.Rev. 980 (1947); 30 C.J.S. Equity § 98 (1965); 27 Am.Jur.2d Equity § 136 (1966).

■ Under the facts of the present case, we need not reach the question of the validity of the Commission's formula, because we find, as a matter of law, that the amount of demurrage that would have accrued had the Board of Health not intervened would have been greater than the $10,260 in demurrage charges that did in fact accrue. Accordingly, plaintiffs are not entitled to relief. The Commission did not make a finding of fact as to how much demurrage would have accrued had the Board of Health not intervened, but, had the Commission made a finding that this amount would have been less than $10,260, we would have had to reverse under 5 U.S.C. § 706(2)(E) for lack of substantial evidence to support such a finding.

We have reached this conclusion after a careful review of the administrative record. Plaintiffs baldly assert in their brief that they would have worked twenty-four hours a day to process the fishmeal and release the cars. There is not a scintilla of evidence in the record to support this claim, not even so much as a verified statement to this effect by an official of the plaintiff. Plaintiffs argue that the fact that they worked around the clock to comply with the Board of Health's order to remove the fishmeal within five days supports their claim that they would have done the same to avoid the demurrage charges. But this only shows that plaintiffs were willing to work twenty-four hours a day to avoid the wrath of the Board of Health; it does not support the proposition that they would have worked to process the meal around the clock to avoid demurrage charges.

The most important evidence on this point is the fact that plaintiffs did *not* in fact work twenty-four hours a day to un-

load the cars in the four days they could have prior to the issuance of the Board of Health's order. Fifteen cars were constructively placed at 5:00 P.M. on August 24. Twenty-seven additional cars arrived on August 25, and four more on August 26. The plaintiffs did not receive the Board of Health's order until 4:30 P.M. on August 28, and there is nothing on the record that indicates any form of restraint prior to this time. Yet plaintiffs did not work twenty-four hours a day at any point in time between 5:00 P.M., August 24, and 4:30 P.M., August 28. In fact, plaintiffs did not process a single car during this period. We think that these undisputed facts completely belie plaintiffs' assertions that they would have worked twenty-four hours a day to avoid demurrage charges.

Without a round the clock operation, it would have been impossible for the plaintiffs to avoid the accrual of more than $10,260 in demurrage charges. Defendant's witness Martin L. Holland calculated that $18,230 in demurrage charges would have accrued had the Board of Health not intervened, based on a five day, eight hours per day, work week. Record Doc. No. 13, Exhibit 2B, Exhibit MLH–7. We have examined Holland's figures and find them to be reasonably accurate. Therefore, we affirm that portion of the Commission's decision finding plaintiffs liable for the entire $10,260 in demurrage charges, but we express no opinion as to the validity of its rationale.

## V. APPLICABLE LAW ON REMAND

One further matter must be discussed in connection with the challenge to the reasonableness of line haul charges. During the administrative proceedings conducted concerning this case, Congress passed the Railroad Revitalization and Regulatory Reform Act of 1976.[9] P.L. 94–210, 90 Stat. 31 (1976). Section 202 of this Act, 49 U.S.C.A. § 10709 (1979), amended the Interstate Commerce Act so that now the Commission is required to make a finding of market

---

**9.** Judge Allard rendered his initial decision on November 12, 1975. Plaintiffs' final administrative appeal was denied on September 17,

1976. The new legislation was passed on February 6, 1976.

dominance over a service before it can find a rate for railroad service to be unreasonable. "Market dominance" is defined as "an absence of effective competition from other carriers or modes of transportation for the transportation to which a rate applies." *Id.* § 10709(a). Because the inadequacies of the Commission's decision necessitate a remand for further proceedings concerning the reasonableness of the underlying class rate, we must consider whether this new law should be applied on remand. In *Burlington Northern, Inc. v. United States*, 555 F.2d 637, 640 (8th Cir. 1977), the Eighth Circuit decided, without citing any supporting authority, that the Commission's duty to make a finding of market dominance arises only in proceedings begun after promulgation of the 1976 law. However, in *Potomac Electric Power Co. v. United States*, 584 F.2d 1058, 1066–67 (D.C. Cir.1978), on facts very similar to those of the present case, the District of Columbia Circuit held that on remand, the Commission should conduct its proceedings in accordance with the new law. Noting that the "general rule concerning the effect of a change in law pending appeal is that an appellate court applies the law in effect at the time of its decision unless to do so would be manifestly unjust or in contravention of the statute or the expressed intent of Congress," *id.* at 1066, *citing Bradley v. School Board*, 416 U.S. 696, 710–16, 94 S.Ct. 2006, 2015–2019, 40 L.Ed.2d 476 (1974), the court found that "the strong congressional conviction that rates should be set by competitive forces when such forces exist" made the case an appropriate one for application of the general rule. 584 F.2d at 1067. We agree with the District of Columbia Circuit decision in *Potomac Electric.* Accordingly, we hold that the Commission should apply present law on remand in its determination of the reasonableness of the charges.

### ORDER

Accordingly,

IT IS ORDERED that:

1. The plaintiffs' Motion for Summary Judgment be GRANTED to the extent that the Commission's order in Docket No. 36047 with respect to the line haul charges is vacated and the case is remanded to the Commission for further proceedings consistent with the foregoing opinion. In all other respects the plaintiffs' said motion is DENIED.

2. The defendants' and intervenors' Motions for Summary Judgment be GRANTED to the extent that the Commission's order in No. 36047 with respect to demurrage charges is affirmed. In all other respects said motions are DENIED.

### MEMORANDUM OPINION AND ORDER

The plaintiffs in Civil Action No. 77–813 have moved for a rehearing to amend our judgment in this case insofar as it incorporates by reference that portion of our opinion dated February 17, 1981 that directs the ICC on remand to apply present law in determining the reasonableness of line-haul charges. Movants urge that we erred in deciding that present law be applied as they fall within one of the exceptions to the rule that present law should be applied to a case on appeal. Defendant Interstate Commerce Commission (ICC), in its response to plaintiffs' motion, argues that the Fifth Circuit's recent decision in *Central Power and Light Co. v. United States and Interstate Commerce Commission*, 639 F.2d 1104 (5th Cir. 1981) (hereinafter *CP&L*) requires us to remand this case to the ICC for initial determination of applicable law. Finally, intervenors argue that plaintiffs do not fall within the exception cited by plaintiffs to the general rule that present law be applied on appeal and that the *CP&L* decision does not require initial determination of the applicable law by the ICC. By agreement this issue was submitted for determination on the memoranda of counsel.

Initially we note that we agree with intervenors that the Fifth Circuit's decision in *CP&L* does not require us to allow the Commission to make the initial determination of applicable law. In that case the Court simply declined to decide the issue of

applicable law on remand because the issue had not been adequately briefed. However, we also believe that this issue has not been adequately briefed for our consideration either.

We concluded in our original opinion that nothing in the Railroad Revitalization and Regulatory Reform Act of 1976 (the 4R Act), P.L. 94–210, 90 Stat. 31 (1976), indicated a Congressional intent that the new law be applied only prospectively. However, 49 U.S.C. § 10709, that part of the 4R Act which requires the ICC to find within 90 days of the start of the proceeding that the carrier proposing the rate have market dominance over the transportation to which the rate applies, has been amended by the Staggers Rail Act of 1980, P.L. No. 96–448, 94 Stat. 1895. That amendment establishes a threshold determined by the the revenue cost ratio associated with a rate, below which market dominance may not be found. As noted by the Fifth Circuit in *CP&L*, this staged increase may indicate a Congressional intent that this section would apply only to rates filed on or after October 1, 1980. This issue has not been addressed by any of the memoranda submitted by counsel. We now leave to the ICC the determination of what law to apply on remand.

Accordingly, Section V of our Memorandum Opinion of February 17, 1981 is now withdrawn and that portion of the judgment incorporating that section of the Memorandum Opinion by reference is vacated. Plaintiffs' motion, to the extent it seeks to have us direct what law is to be applied on remand, is DENIED.