The **ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY; William M. Gibbons, Trustee of the Property of Chicago, Rock Island & Pacific Railroad Company, Debtor; Fort Worth and Denver Railway Company; Missouri-Kansas-Texas Railroad Company; and Missouri Pacific Railroad Company, Petitioners,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**

and

**Farmers Export Company, Intervenor.**

No. 81–2429.

United States Court of Appeals, Seventh Circuit.

Argued May 14, 1982.
Decided Aug. 16, 1982.

Richard E. Weicher, Santa Fe Industries, Law Dept., Chicago, Ill., for petitioners.

Charles A. Stark, Gen. Counsel, I. C. C., Washington, D. C., for respondents.

Richard S. M. Emrich, Chicago, Ill., for intervenor.

Before BAUER, Circuit Judge, DAVIS, Judge,[*] and COFFEY, Circuit Judge.

DAVIS, Judge.

This is a proceeding to review two decisions of the Interstate Commerce Commission ("ICC") in which the Commission ordered the petitioners, five railroad carriers, to refund the penalty portion of certain demurrage charges to Farmers Export Company ("Farmers Export"), the intervenor. Jurisdiction rests in this court under 28 U.S.C. § 2321(a) and § 2342(5) (1976 & Supp. IV 1980). We affirm.

## I.

Railroads assess demurrage charges[1] against shippers and receivers for detaining freight cars beyond certain periods known as "free time." The demurrage concept embraces both compensatory and penalty elements. We are concerned only with the penalty portion of demurrage charges assessed against Farmers Export Company, a grain exporter that operated a grain elevator in Galveston, Texas. The compensatory element of demurrage charges is designed to cover the railroads' "per diem" cost for the use of the rail car. In contrast, the penalty element promotes the prompt return of cars by shippers and receivers. While penalty charges increase over the period of time that a rail car is detained, compensatory charges are paid at a level rate for all time that a car is held by a shipper or receiver. ICC rules provide that a shipper or receiver is allowed a certain period of "free time" to load or unload railroad cars, after which demurrage charges begin to accrue. Demurrage is then imposed on a scale that reflects increasing penalty charges, for example, $10 for each of the first four chargeable days, $20 per day for the next two days, and $30 per day thereafter. *See Central Ill. Pub.*

---

[*] The Honorable Oscar H. Davis, Associate Judge, United States Court of Claims, sitting by designation.

1. Two alternative methods of computing demurrage have developed. *See Central Ill. Pub. Serv. Co. v. ICC,* 659 F.2d 820, 821 (7th Cir. 1981). At issue in this case is the "straight demurrage" method, in which charges are computed separately on each car. The alternative is known as the "average agreement" method, in which demurrage charges assessed against certain rail cars may be offset by credits earned by the early release of other cars. For a discussion of the latter method, see *Monongahela Power Co. v. ICC,* 640 F.2d 504, 506 (4th Cir.), *cert. denied,* 454 U.S. 824, 102 S.Ct. 111, 70 L.Ed.2d 97 (1981) ("The principal purpose of that [average] agreement was to spread demurrage liabilities over all shipments, rather than calculate them solely on an individualized per car basis.").

*Serv. Co. v. ICC,* 659 F.2d 820, 821 (7th Cir. 1981) (citing Freight Tariff 4–K, ICC H–74, General Car Demurrage Rules and Charges, effective July 1, 1977).

The ICC regulates demurrage charges pursuant to its statutory authority to initiate and implement rules and regulations contributing to sound car service. *See, e.g., ICC v. Oregon Pacific Industries, Inc.,* 420 U.S. 184, 189–91, 95 S.Ct. 909, 913–14, 43 L.Ed.2d 121 (1975). This ICC regulatory power over demurrage charges was reinforced by the enactment of the Rail Revitalization and Reform Act of 1976 ("4R Act"), Pub.L.No.94–210, 90 Stat. 31 (codified in scattered sections of 49 U.S.C.), which added the following provision to the Interstate Commerce Act:

> Demurrage charges shall be computed, and rules and regulations relating to such charges shall be established, in such a manner as to fulfill the national needs with respect to (a) freight car utilization and distribution, and (b) maintenance of an adequate freight car supply available for transportation of property.[2]

Petitioners do not contest the ICC's authority to regulate demurrage charges, but assert that the ICC's decisions before us were arbitrary, capricious, an abuse of discretion, and unsupported by substantial evidence, and should therefore be overturned pursuant to the Administrative Procedure Act, 5 U.S.C. § 706 (1976).

## II.

The case arises out of events following the catastrophic explosion which occurred at the Farmers Export grain elevator in Galveston on the evening of December 27, 1977. It is agreed that the explosion was beyond Farmers Export's control. At the time, there were 519 rail cars awaiting unloading at the Farmers Export facility, and another 1,174 cars carrying grain were en route.[3] One ship was docked at the elevator loading grain for export, and several ships were offshore awaiting their turn to pick up grain. The grain elevator facility, then one of the busiest in the South, was rendered inoperable by the sudden explosion which killed 18 people and injured 22 others.

The day after the explosion, Farmers Export applied to the ICC for a service order permitting diversion and reconsignment of the rail cars either en route to the grain elevator or already at the facility. The result was ICC Service Order No. 1293, issued on December 30, 1977, which allowed diversion or reconsignment of cars without payment of additional charges that would normally be due for these services. The petitioners did not oppose this emergency service order. In addition to allowing free transfers to other Gulf coast ports, the service order provided a day free from demurrage at Galveston, removed the cars from demurrage during the time necessary to divert them to another port, and granted two additional free days to allow for unloading at the new port.

Within the time allotted in the service order (31 days), Farmers Export diverted or reconsigned all of the rail cars which were either already at the grain facility or en route. Farmers Export did permit all cars en route to Galveston to continue to Galveston, where they were then reconsigned. Despite the issuance of the service order and Farmers Export's ultimate success in diverting or reconsigning all the rail cars from the Galveston facility within the time specified in the order, substantial demurrage charges accrued on the grain cars lo-

---

**2.** 49 U.S.C. § 1(6) (1976), *amended by* Revised Interstate Commerce Act of 1978, Pub.L.No. 95–473, 92 Stat. 1394 (current version at 49 U.S.C. § 10750 (Supp. IV 1980)). A "pool system" for the utilization of freight cars exists in the United States. Under that system, a freight car owned by an individual railroad can be used by all rail carriers transporting goods in the United States. *See Baltimore & O. C. T. R. v. United States,* 583 F.2d 678, 681 (3d Cir.

1978), *cert. denied,* 440 U.S. 968, 99 S.Ct. 1520, 59 L.Ed.2d 784 (1979) (upholding an ICC regulation "requiring the remittance to freight car owners of all demurrage charges collected by the delivering carrier that are in excess of ten dollars per day per car").

**3.** A few days before the explosion, the railroads embargoed grain shipments to the elevator because of the car accumulation and delay.

cated at the facility at the time of the explosion or arriving shortly thereafter. Total demurrage charges of $481,790 were assessed, of which approximately $308,000 constituted penalty demurrage. Farmers Export paid the total amount due, but in the fall of 1978 filed a complaint with the ICC to recover the penalty portion of the demurrage paid for delay after the explosion. The Administrative Law Judge found that the demurrage charges were reasonable, and dismissed Farmers Export's complaint. Farmers Export's subsequent appeal to the review board (Review Board No. 4) was also unsuccessful. Farmers Export then sought administrative review before the ICC, which was summarily denied.

In May 1980, Farmers Export sought review of the adverse ICC decision in the United States Court of Appeals for the Tenth Circuit, which subsequently transferred the case to the Eighth Circuit. On October 2, 1980, the entire ICC voted to reopen the Farmers Export case for further administrative consideration. The Eighth Circuit accordingly remanded the proceeding to the ICC on October 6, 1980.

On remand, the full ICC reversed the prior determinations of the Administrative Law Judge and Review Board No. 4 and concluded that Farmers Export was entitled to a refund of the penalty demurrage (decision of April 13, 1981). Shortly thereafter, the ICC issued a supplemental decision defining the penalty portion of the demurrage charges to be refunded (decision of May 7, 1981). In July 1981 the Commission denied the railroads' petition to reopen the April 13 decision and their request for stay. The railroads then brought this proceeding seeking judicial review of the final, adverse ICC decisions of April 13 and May 7, 1981.

### III.

■ As outlined in the ICC's decision in *Prince Mfg. Co. v. Norfolk & W. Ry.*, 356 I.C.C. 702 (1978), there are two separate questions which must be considered in determining whether a shipper is entitled to a refund of penalty demurrage charges: (1) Did the shipper proximately cause the detention of rail cars which led to the assessment of demurrage charges?, and (2) Did the shipper exercise due diligence to avoid or abate the demurrage charges? *See also Ormet Corp. v. Illinois Cent. R. R.*, 341 I.C.C. 647 (1972). In considering the second prong of the test, the ICC has held that "the focus should be on what is *reasonable under the circumstances* rather than the requirement that the shipper do everything in its power to avoid or abate detention." *Prince Mfg. Co. v. Norfolk & W. Ry.*, 356 I.C.C. at 706.

■ The railroads do not challenge this formulation but say, rather, that the refund of the full penalty portion of demurrage charges is in essence an equitable remedy not warranted by the particular facts of this case. They contend that substantial demurrage would have accrued regardless of the explosion, a position supported (they say) by the fact of existing rail car congestion at the time of the explosion at the facility. The railroads also point out that they incurred substantial expenses in providing the special handling required by Service Order No. 1293, and their position is that these expenses actually exceed the penalty portion of the demurrage charges to be refunded to Farmers Export. Petitioners likewise complain of lost revenues due to the railroads' inability to use the rail cars during the diversion and reconsignment process. They assert that, on the other hand, Farmers Export gained from the special provisions of the Service Order, and that this benefit must be taken into account. In view of this combination of circumstances, petitioners urge that the ICC's decisions to refund the penalty portion of the post-explosion demurrage were arbitrary, capricious, and contrary to the substantial evidence in the record.

The Commission first found that Farmers Export was not the proximate cause of the post-explosion detention but that the explosion, which was in no way due to that company, was a superseding cause which acted to break the chain of proximate causation. Petitioners do not deny that this

was an intervening cause, but answer that the congestion which existed at the facility prior to the explosion indicates that some rail car detention would have taken place even if the explosion had not occurred. Referring to dicta in a recent district court opinion,[4] the railroads argue that, where a substantial amount of demurrage was inevitably bound to accrue regardless of the intervening explosion, the ICC's award of relief from *all* penalty demurrage is arbitrary and unsupported.

Although it might be that the Commission could itself adopt such a proportional rule, we cannot say that it was compelled to do so in this case in which the refund pertains only to penalty demurrage accruing on cars arriving at Galveston *after* the explosion. The ICC's finding that the explosion was a superseding event which proximately caused this rail car detention avoids potentially troublesome speculation and litigation as to the amount of demurrage which would have accrued on rail cars at the facility in the absence of the explosion.[5] Moreover, the policy that warrants assessment of penalty demurrage charges—encouraging shippers and receivers to promptly return rail cars into the stream of commerce—is inapplicable in a case such as this, where the shipper is essentially powerless to avoid the intervening event. The Commission could choose to accept the normal rules of supervening cause and concentrate, instead, on the shipper's due diligence after that intervening event.

Secondly, we are called upon to consider the soundness of the ICC's determination that Farmers Export exercised due diligence, after the explosion, in avoiding or abating the demurrage charges. Petitioners contend that the ICC's determination fails to meet the requisite standard because that body ignored the fact that Farmers Export did not divert any rail cars en route to Galveston at the time of the explosion. We think, however, that there is adequate support for the ICC's determination that Farmers Export's failure to divert cars en route to Galveston does not evidence a lack of diligence, but rather indicates sound judgment at a critical juncture in the company's operations. The operative standard is not whether Farmers Export did everything humanly possible to avoid demurrage, but whether it acted reasonably in the circumstances.

There is ample support for this finding. First, Farmers Export acted very promptly in obtaining issuance of Service Order No. 1293, which alleviated the delay problem. Then Farmers Export conducted a thorough and exhaustive search for alternate empty elevator space. This search was made all the more difficult in view of a grain elevator explosion which had occurred in Louisiana only five days earlier, and the subsequent walkout of Federal Grain Inspection Service inspectors whose services are required in a grain export operation. These events produced a scarcity of empty grain elevator space, and compounded the problems facing Farmers Export, whose own facility was rendered inoperable by the

4. *New Orleans & Lower Coast R. R. v. International Proteins Corp.*, 514 F.Supp. 46 (E.D.La. 1981). In *International Proteins*, shippers of watersoaked fishmeal sought a waiver of the penalty element of demurrage charges which allegedly accrued because an order of a Board of Health prohibited unloading of the fishmeal. In his opinion, Judge Boyle stated:

> In cases such as these, the most logical way to resolve the matter would be to require the shipper to pay the difference between the amount of demurrage that actually accrued and the amount of demurrage that would have accrued in any event due to the shipper's failure to exercise due diligence. Thus, if $10,000 in demurrage charges accrued due to the intervention of an uncontrol-

lable force, but $3,000 would have accrued in any event due to the shipper's failure to exercise due diligence, then the shipper should be required to pay $7,000.

514 F.Supp. at 54. However, the judge ultimately denied plaintiff any relief from the penalty demurrage charges (affirming the Commission's decision), finding that "the amount of demurrage that would have accrued had the Board of Health not intervened would have been greater than the $10,260 in demurrage charges that did in fact accrue." *Id.* at 55.

5. Here, for instance, the parties are at odds as to whether there would have been any such demurrage (and, if so, in what amount).

explosion. That demurrage charges would accrue in such a situation is hardly surprising. As the ICC found, "[T]here were always more cars for FEC's account at Galveston than alternative elevators at which to place the grain." 364 I.C.C. at 837. To allow cars to continue to Galveston rather than divert them en route made sense logistically, and at the same time avoided incurring additional demurrage because rail cars already at the facility were accruing demurrage while cars en route were not. The record indicates, too, that Farmers Export began reconsigning cars already at the facility in a diligent manner. A substantial number of cars were diverted to an adjacent facility operated by the Bunge Corporation, a move which avoided the necessity of "switching" and thereby reduced additional cost to the railroads. Several 100-car trains were used to move grain to Houston, again reducing potential cost to the railroads. Farmers Export diverted or reconsigned *all* cars, including those en route to Galveston, within 31 days, the time allotted in Service Order No. 1293. We hold, therefore, that the ICC's determination that Farmers Export acted with due diligence, after the explosion, to avoid demurrage is supported by substantial evidence.

█ Petitioners respond that, even if this is the proper conclusion, the railroads provided many free services to Farmers Export, and that the ICC's decisions allowing refund of the penalty demurrage gives Farmers Export a "double free ride." This argument that free services were provided to Farmers Export is, in practical effect, an attack upon the adverse consequences imposed on the petitioners by the issuance of Service Order No. 1293. The net result of the service order was to allow diversion or reconsignment of cars without payment of additional handling charges which would normally be due for these services. The service order also removed rail cars from demurrage during reconsignment, and provided other free time. It is the cost of providing these services without adequate compensation which petitioners vigorously contest. But they did not contest the issuance of Service Order No. 1293. Review

of that order was available to petitioners in the court of appeals pursuant to 28 U.S.C. § 2321(a) (1976), within sixty days after entry of the order. 28 U.S.C. § 2344 (1976). They did not avail themselves of this opportunity for appellate review, and to the extent they now challenge the validity of Service Order No. 1293, their contention is barred by the 60-day limitations period. *Id.* See also *Asphalt Roofing Mfg. Assn. v. ICC*, 567 F.2d 994, 1005 (D.C.Cir.1977).

█ Nor was the Commission required to take account of these extra costs in assessing the equitable aspects of a *penalty* refund. The penalty aspect of demurrage does not have the objective of compensating the railroads for the costs of delay. Rather, such demurrage charges are intended as a deterrent to prevent shippers and receivers from detaining a rail car for an unwarranted period of time. *Turner Lumber Co. v. Chicago, M. & St. P. Ry.*, 271 U.S. 259, 262, 46 S.Ct. 530, 531, 70 L.Ed. 934 (1925); *Monongahela Power Co. v. ICC*, 640 F.2d 504, 505 (4th Cir.), *cert. denied*, 454 U.S. 824, 102 S.Ct. 111, 70 L.Ed.2d 97 (1981). As the three-judge district court stated in *Iversen v. United States*, 63 F.Supp. 1001, 1005 (D.D.C.), aff'd *per curiam*, 327 U.S. 767, 66 S.Ct. 825, 90 L.Ed. 998 (1946):

> [D]emurrage charges are in part compensation and in part penalty; ... in full character they are neither, not being rates as that term is used in connection with rate-making, nor penalties as that term is used in respect to penal impositions. They are sui generis.

The compensatory element of the demurrage charges assessed against Farmers Export is not at issue. All that is before us is the penalty element of those demurrage charges, which are not assessed to cover the transportation services provided, but rather are imposed on the basis of the number of days a rail car is detained. The ICC properly concluded that "penalty demurrage is not compensation for services rendered." 364 I.C.C. at 838. This determination is legally sound and in accord with judicial and administrative precedent. Compensation to the railroads did not have to be considered.

## IV.

Petitioners final argument is that the Commission, in its supplemental decision of May 7, 1981, improperly defined the penalty portion of the demurrage charges to be refunded. The ICC there defined penalty demurrage charges as "that portion of the total demurrage charges for each car that exceeds the per diem basis for such car at the time the demurrage accrued, plus 20 percent for incidental expenses, without free time for loading or unloading and without allowance for Saturdays, Sundays or holidays." 364 I.C.C. at 950. While conceding that this definition was developed in the previous ICC decisions in *Prince* and *Ormet, supra,* the railroads argue that different circumstances are present here which preclude use of the "per diem plus 20 percent" formula. These "different circumstances" are said to be lost revenues based on rail traffic which allegedly could have been handled had not the rail cars been detained at Galveston.

This argument has little merit, and is in effect a variant of the position that penalty demurrage charges should be offset against the railroads' cost in providing service pursuant to Service Order No. 1293. Petitioners again fail to recognize that demurrage charges consist of both a compensatory and a penalty element, and that this case deals only with the penalty aspect.[6] Their contention also fails to consider the full scope of *compensatory* demurrage. In *Central Ill. Pub. Serv. Co. v. ICC,* 659 F.2d 820, 822 n.4 (7th Cir. 1981), this court recently enunciated its definition of compensatory demurrage, saying that "[t]he compensation portion of the demurrage charge is that amount which adequately compensates the carrier for its *losses and expenses* resulting from the shipper's detention of the cars. (Emphasis added.) Thus, the per diem plus 20 percent formula is designed to compensate a carrier for losses, which presumably

encompass lost revenue opportunities. Even though this formula as applied to petitioners might not adequately compensate them for all lost revenue opportunities, the ICC did not have to expand the concept of penalty demurrage for this case to make up for that deficiency by considering lost revenue opportunities in connection with the penalty aspect.

The result of our scrutiny of the ICC's decisions in this proceeding is that we find that the subject matter—penalty demurrage—has been committed by Congress to the reasonable discretion of the Commission. That agency has large leeway and its determinations here were reasonable, not contrary to law, and supported by substantial evidence. Accordingly, the decisions of the ICC meet all of the standards for judicial acceptance of a determination within the purview of that agency.

AFFIRMED.

---

6. Petitioners cite the federal district court opinion in *Westinghouse Elec. Corp. v. United States,* 388 F.Supp. 1309 (W.D.Pa.1975), in support of their position that penalty demurrage charges should reflect lost revenue opportunities. While that opinion might be fairly read as requiring the ICC to make a "judgmental deter-

mination" instead of applying a "mechanical formula" in determining a maximum reasonable rate for a particular shipment of goods (electrical equipment), the opinion does not concern demurrage charges and is therefore quite removed from the present case.